J. H. BAIRD PUBLISHING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 88428, 89711.   Filed December 28, 1962.

*William Waller, Esq.*, for the petitioner.
*Michael P. McLeod, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax of the petitioner in the years and amounts as follows:

| Docket No. | Year | Amount |
|---|---|---|
| 88428 | 1956 | $13,687.66 |
| 89711 | 1957 | 13,816.19 |

The issues for decision are: (1) Whether petitioner exchanged business property for property of a like kind plus cash, within the meaning of section 1031 of the Internal Revenue Code of 1954, with the result that the gain is recognizable only to the extent of the cash received, or whether, as determined by the respondent, petitioner sold its property, with the result that the full amount of gain is taxable to the petitioner; (2) if there was a sale, whether it was consummated in 1956 or 1957; and (3) whether petitioner sustained losses upon the disposition of certain real estate and stock in 1952 resulting in a capital loss carryover to either 1956 or 1957.

### FINDINGS OF FACT.

Some of the facts have been stipulated and the stipulations are incorporated herein by this reference.

The petitioner, a Tennessee corporation, filed its income tax returns for the taxable years 1952, 1956, and 1957 with the district director of internal revenue, Nashville, Tenn. During all of such years it was in the business of publishing a trade paper, the Southern Lumberman, in Nashville.

Since 1917 petitioner's stock has been owned equally by J. H. Whaley, who was its president and treasurer, and by Stanley F. Horn, Sr., who was its vice president and secretary. Whaley, who handled the business affairs of petitioner, and Horn, who was the editor of the paper, were aged 77 and 72, respectively, at the time of trial.

For several years petitioner had conducted its business in a building which it owned on Berryhill Street in Nashville, Tenn. In October of 1956 the land had a basis in the hands of petitioner of $2,000. The buildings thereon had been fully depreciated except for recent improvements of $899.34.

For some time prior to 1956 the Baptist Sunday-school board in Nashville had been acquiring property in the area in which petitioner's building was situated and by 1956 owned property in the same block. In their prior acquisitions of property, such board had been represented by Murphree Realty Co. (sometimes referred to hereinafter as the Realty Co.), whose president was John W. Murphree. The Sunday-school board was desirous of rounding out its holdings in such block and on several occasions prior to 1956 it had approached the petitioner about purchasing petitioner's property. In each instance the petitioner refused to sell, despite attractive offers, because

it was satisfied with its location and because it did not wish to incur the tax on the capital gains which would result from such a sale.

In 1956 the Sunday-school board, now acting through the Murphree Realty Co., again offered to purchase petitioner's Berryhill Street property, but the petitioner again refused to sell for the same reasons. Thereupon Murphree conceived a plan of having the Sunday-school board construct a building and exchange it for the petitioner's building. Whaley in refusing, on behalf of the petitioner, to sell the property had indicated that the only type of deal petitioner would be interested in would be an exchange of its building for a suitable building. The Sunday-school board considered Murphree's proposal that they construct a building for purposes of exchange, but rejected it.

Thereafter Murphree suggested to Whaley that he, Murphree, should construct a building and trade it for the petitioner's building. Whaley advised Murphree he was willing to proceed on that basis because on the basis of a trade there would be a saving in taxes.

In anticipation of constructing such a building, Murphree Realty Co. on June 12, 1956, paid $50 to Suburban Industrial Development Co., referred to as Sidco, for an option to purchase its lot No. 74.

Murphree's attorneys prepared a contract, which was executed on June 18, 1956, by petitioner, by its president Whaley, and by Murphree Realty Co., by its president Murphree. Therein, after reciting that the petitioner owned the Berryhill Street property and that it desired to trade such property for a suitable building, it was provided:

Now, THEREFORE, it is agreed that MURPHREE will have the right to execute an option giving to a prospective purchaser the absolute right to buy from MURPHREE the above property, provided, however, that BAIRD [the petitioner] will have the right to occupy the property rent free until MURPHREE has provided BAIRD with another building as hereinafter set out.

For and in consideration of the agreement of BAIRD, MURPHREE agrees within a reasonable time to build a building and if the building is built, then BAIRD is to approve the plans and specifications and said building and lot is to be accepted by BAIRD on a basis of a value of $35,000.00 and MURPHREE, in addition to the building to be provided, agrees to pay to BAIRD the sum of $22,700.00. If the cost of the building and lot to be built by MURPHREE exceeds the fixed value hereinabove set out, then the cash payment to be made by MURPHREE shall be reduced to [by] the amount of said excess and if the cost of the building and lot is less than the amount set out above, then the cash payment payable by MURPHREE shall be increased by the difference between the actual cost and the sum set out herein.

BAIRD agrees to deed his property on Berryhill Street to MURPHREE on MURPHREE'S order and it is understood that MURPHREE may execute options wherein MURPHREE agrees to sell the Berryhill property subject to the conditions hereinabove set out as to continued occupancy by BAIRD.

It is also understood that MURPHREE will within a reasonable time submit plans to BAIRD for the building of a new building and it is contemplated that

MURPHREE will erect said building on Lot No. 74 of the Suburban Industrial Development Company Plan * * *. It is further agreed that this contract, if entered into by BAIRD, will be approved by two-thirds' vote of the stockholders of BAIRD and the stockholders and directors will authorize J. H. Whaley, the president, to execute this contract and any and all deeds necessary to convey the Berryhill property. * * *

On October 15, 1956, the Realty Co. purchased lot No. 76, which was an unimproved lot in the Sidco subdivision (which was substituted for lot No. 74) for $6,900.

On October 31, 1956, the petitioner executed a deed of the Berryhill property to the Realty Co.

On the same date the Realty Co. executed a deed of the Berryhill property to the Sunday-school board for a consideration of $60,000, payment of which was made by check of the Sunday-school board to the Realty Co.

Of the $60,000 the Murphree Realty Co. deposited $50,096.89 in the Third National Bank in Nashville, Tenn., under the name of "Murphree Realty Co., Escrow Agent for J. H. Baird Publishing Co." The amount deposited was the sale price, less the cost of the Sidco lot of $6,900, taxes and fees aggregating $745.61, an amount of $2,350, which was retained by the Realty Co., and plus an amount of $92.50 representing the tax and fee for recording the deed of the Berryhill property which was reimbursed to the Realty Co. by the Sunday-school board.

The money in the escrow account was used, to the extent required, for construction of the building on the Sidco property to the specifications of the petitioner. Construction was promptly begun.

Withdrawals from the escrow account were by checks signed by Murphree Realty Co., by John W. Murphree, president, in payment for invoices approved by the petitioner.

At some time in 1957, after completion of the new building, the petitioner and Murphree Realty Co. executed another contract which was intended to supersede the prior contract executed on June 18, 1956. The new contract shows an execution date of June 18, 1957, but such date was inserted in error, the parties having intended to show the same execution date as the first contract. Such second contract contains the following provisions:

BAIRD [the petitioner] is to occupy 917 Berryhill free of rent until April 1, 1957, after which time BAIRD will be responsible to any new owner of the property. BAIRD is to approve any contractor, plans and specifications and any change or agreements after the original selection will be between BAIRD and the Contractor to erect the building.

MURPHREE agrees to give BAIRD $19,542.13 and Lot 76 and the building erected thereon for the property located at 917 Berryhill.

BAIRD agrees to deed his property on Berryhill Street to MURPHREE on MURPHREE's order and it is understood that MURPHREE may execute options

wherein MURPHREE agrees to sell the Berryhill property subject to the conditions hereinabove set out as to continued occupancy by BAIRD.

It is further agreed that this Contract, if entered into by BAIRD, will be approved by a two-thirds' vote of the stockholders of BAIRD and the stockholders and directors will authorize J. H. Whaley, the President, to execute this Contract and any and all deeds necessary to convey the Berryhill property. * * *

On July 19, 1957, the Sidco property, as improved by the building erected thereon, was deeded to the petitioner by Murphree Realty Co.

None of the $60,000 purchase price of the Berryhill Street property was paid directly to the petitioner until after the cost of the new building on the Sidco lot, $33,726.04, was established. The amount of cash which the petitioner received, in addition to the new property, was $17,055.65.

In its income tax return for the taxable year 1957 the petitioner reported as long-term capital gain to be recognized upon the above transaction the amount of $17,055.65 with the notation "Exchange of land and building at 913 Berryhill Street for land and building at 2916 Sidco Drive—boot."

About 1928 Horn and Whaley participated in a syndicate which purchased several hundred acres of land on Lookout Mountain, near Chattanooga, Tenn., as a speculative venture, hoping to sell the land to a developer for a quick profit. Horn and Whaley obtained a one-eleventh interest at a cost of $15,000. The syndicate was unable to sell the land, due to the depression, and in July 1931 the members of the syndicate formed a corporation known as Mt. View Corporation with a capitalization of $1,320 represented by 132 shares of $10-par-value stock, and the Lookout Mountain property was transferred to the corporation in a nontaxable transaction. Horn and Whaley received 12 shares of the stock of such corporation. Mt. View Corporation never made any attempt to develop the property, its sole activity being to hold title and pay the taxes thereon.

On or about October 16, 1946, Horn and Whaley transferred their stock in Mt. View Corporation to the petitioner in consideration of the cancellation of their indebtedness to petitioner in the total amount of $15,000. Thereafter, on August 12, 1952, petitioner sold the stock of Mt. View Corporation for $423.24 and reported in its return for that year a capital loss from such sale in the amount of $14,576.76. Mt. View Corporation was liquidated in about 1952, and none of its financial records are available.

Several years prior to 1946, Horn and Whaley had acquired, at an undisclosed price, certain property known as the Gardner Tract, in the Belle Meade section of Davidson County, Tenn., which was a desirable residential section. By 1946 this property had been subdivided and all lots had been sold with the exception of an area which was not accessible from a public road.

In 1946, Horn and Whaley transferred the above-referred-to remaining area of land to petitioner in consideration of the cancellation of their indebtedness to petitioner in the total amount of $5,000. On July 22, 1952, petitioner sold such property to one of the owners of the surrounding properties for a net consideration of $1,847.80. Petitioner reported a loss from the sale of this lot in its 1952 income tax return in the amount of $3,152.20.

Petitioner, having reported no capital gains on any return between 1952 and 1956, inclusive, reported the loss on the sale of the Mt. View stock ($14,576.76) and the loss on the sale of the Gardner Tract property ($3,152.20) totaling $17,728.96 as an unused capital loss carryover from the year 1952 in its income tax return for 1957. This had the effect of completely offsetting the amount of $17,055.65 reported by it in 1957 as the recognizable long-term capital gain on the transaction involving the disposition of its Berryhill Street property.

In a deficiency notice dated June 27, 1960, covering the years 1956 and 1957, the respondent determined that the petitioner sold its Berryhill Street property in 1956 and that it realized a long-term capital gain in the amount of $54,750.66 therefrom which is includable in taxable income in accordance with sections 61 and 1231 of the Internal Revenue Code of 1954. His computation was as follows:

| | |
|---|---:|
| Selling price | $60,000.00 |
| Less: Selling commission | 2,350.00 |
| Net proceeds | 57,650.00 |
| Deduct: Adjusted basis (building and land) | 2,899.34 |
| Gain recognized | 54,750.66 |

Accordingly, the respondent eliminated from taxable income reported by the petitioner for 1957 the amount of $17,055.65 reported as realized from the exchange of the Berryhill property for the Sidco property. The respondent also disallowed the capital loss carryover from the year 1952 claimed in the 1957 return in the amount of $17,728.96 "because it is determined that you sustained no such loss." Nor did the respondent allow any such capital loss carryover from 1952 to 1956. The respondent in his determination allowed the petitioner additional depreciation for 1957 in the amount of $428.39, based on a cost of $33,726.04, on account of the "building which you acquired on or about July 1, of that year."

The petitioner filed a petition with this Court based on such notice of deficiency seeking a redetermination of only the deficiency determined for the year 1956, asserting error in the respondent's determination that it had realized a long-term capital gain of $54,750.66, but contending that if it did realize a long-term capital gain in 1956, the respondent erred in failing to allow a net loss carryover from 1952 in

the amount of $17,728.96. Thereafter the respondent issued on October 6, 1960, another notice of deficiency covering the year 1957 in which he stated:

It is the position of the Internal Revenue Service that you realized taxable income in the year 1956 from sale of a building. However, since you contend that the building was not sold in the year 1956 but was exchanged for property of a like kind in the year 1957, it is determined, in order to protect the interests of the Government, that you realized long-term capital gain in the amount of $54,750.66, the excess of proceeds $57,650.00, over adjusted basis, $2,899.34, which is includible in your taxable income in accordance with section 61 of the Internal Revenue Code of 1954, from sale of the property in the year 1957.

The respondent again determined that the petitioner was not entitled to a capital loss carryover from the year 1952 because "you sustained no such loss."

The Realty Co. was not acting as agent for the petitioner in selling its Berryhill Street property. On July 19, 1957, the petitioner transferred such property to the Realty Co. in exchange for the Sidco property and money in the amount of $17,055.65.

OPINION.

The principal issue is whether the petitioner exchanged its Berryhill Street property for the Sidco property improved with the new building, within the meaning of section 1031 of the Internal Revenue Code of 1954.[1] There is no question that such properties were of like kind within the meaning of the statute.

It is the respondent's contention that Murphree Realty Co., acting as petitioner's agent, sold the petitioner's property and built petitioner a new building, and that petitioner is taxable upon a long-term capital gain measured by the difference between a selling price of $60,000 (less a selling commission of $2,350) and the adjusted basis of $2,899.34. He points to the fact that the $60,000 selling price of the property was placed in a bank account under the name of the Realty Co. as escrow agent for the petitioner, after the Realty Co. had reimbursed itself for the cost of the lots and withheld an amount of $2,350, and that the Realty Co. drew checks against this account to pay bills, after ap-

---

[1] SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT.

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

(b) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—If an exchange would be within the provisions of subsection (a), of section 1035(a), or of section 1036(a), if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

proval of invoices by the petitioner, to construct a building to the specifications of the petitioner. He states that an exchange differs from a sale in that no fixed money price or value is placed upon either of the properties in an exchange, whereas in a sale there is either a money consideration or the equivalent in property, citing *Bloomington Coca-Cola Bottling Co.* v. *Commissioner*, (C.A. 7) 189 F. 2d 14, affirming a Memorandum Opinion of this Court, and *Trenton Cotton Oil Co.* v. *Commissioner*, (C.A. 6) 147 F. 2d 33, reversing a Memorandum Opinion of this Court. The respondent states that here a definite money value was placed upon the Berryhill Street property before it was transferred to the Realty Co. to sell and that a definite money value was placed upon the new property which the Realty Co. was commissioned to acquire or construct for the petitioner.

The respondent further contends that there could not have been an exchange between the petitioner and the Realty Co. in 1956 when the petitioner deeded its property to the Realty Co. since at that time the Realty Co. did not own any property of like kind which it could exchange—that at most what the Realty Co. owned was an unimproved lot (but that in reality even that was held for the benefit of the petitioner). He states that there could have been no exchange in 1957 when the Realty Co. transferred title to the new property to the petitioner since at that time the petitioner itself did not have any property to exchange, having transferred its property away in the prior year.

The petitioner, on the other hand, contends that the Realty Co. was not acting as its agent, that the parties intended, and the contract provided for, an exchange of the petitioner's property for property to be acquired and constructed by the Realty Co., that all the steps taken were parts of a single transaction constituting an exchange, and that consequently it is taxable on only that part of the gain derived which is not in excess of the cash received, $17,055.65. It relies principally upon *W. D. Haden Co.* v. *Commissioner*, (C.A. 5) 165 F. 2d 588, affirming a Memorandum Opinion of this Court, and *Allegheny County Auto Mart, Inc.* v. *Commissioner*, (C.A. 3) 208 F. 2d 693, affirming a Memorandum Opinion of this Court.

There can be no doubt, upon the evidence here, that the petitioner did not desire to make a sale of its property and incur a tax liability upon the large capital gain which would be realized. It consistently refused to sell and its representative stated to Murphree that the only acceptable deal would be one involving an exchange of properties. It is, of course, axiomatic that the parties' expectations or hopes as to the tax treatment of their conduct in themselves are not determinative (*Commissioner* v. *Duberstein*, 363 U.S. 278), and that matters of taxation must be determined in the light of what was actually done rather than the declared purpose of the participants (*Weiss* v. *Stearn*, 265

U.S. 242). We turn then to a consideration of what was actually done—the substance of the transactions. Other cases, although they may be helpful, are not determinative since each case must be decided upon the basis of its own facts.

It seems to us that the primary consideration is the relationship created between the petitioner and the Realty Co.—that is, was an agency created whereby the Realty Co., as agent, sold the Berryhill Street property for the petitioner and with a part of the proceeds acquired or constructed, as agent for the petitioner, the Sidco property.

Agency is founded upon a contract, either expressed or implied, by which one of the parties confides to the other the management of some business, to be transacted in his name or on his account, and by which the other assumes to do the business and to render an account of it. Tiffany, Agency, sec. 4, p. 7, footnote 1 (2d ed.), citing, among other authorities, 2 Kent, Comm. 612, Mechem, Agency, sec. 1 (1914 ed.); and *Plummer* v. *Knight*, 156 Mo. App. 321, 137 S.W. 1019. And in *Central Trust Co.* v. *Bridges*, (C.A. 6) 57 F. 753, it is stated:

An agency is created—authority is actually conferred—very much as a contract is made; i.e., by an agreement between the principal and agent that such a relation shall exist. The minds of the parties must meet in establishing the agency. The principal must intend that the agent shall act for him, and the agent must intend to accept the authority and act on it, and the intention of the parties must find expression in words or conduct between them. * * *

The agreement between the petitioner and the Realty Co. does not purport to create an agency. Therein the petitioner agreed that the Realty Co. should have the right to execute an option giving to a prospective purchaser the absolute right to buy the Berryhill Street property *from the Realty Co.*, provided, however, that the petitioner should have the right to occupy the property rent free until the Realty Co. should provide the petitioner with another building. The petitioner agreed to deed the property to the Realty Co. on the Realty Co.'s order. The Realty Co. agreed to build the building according to specifications approved by the petitioner and on a lot approved by the petitioner, such building to be accepted on a basis of a value of $35,000. In addition, the Realty Co. agreed to pay the petitioner the sum of $22,700. However, the amount of cash to be paid would be decreased or increased depending upon whether the cost of the lot and the building should be greater or less than $35,000. Thus, under the contract, the total value to be received by the petitioner from the Realty Co. was fixed at $57,700.

Insofar as provided by the contract, it was not necessary that the Realty Co. sell the property in the name of the petitioner. Nor, insofar as the contract provided, was the Realty Co. required to account for the selling price of the property. The only requirement

was that it construct a building to be transferred to the petitioner and pay over cash in an amount sufficient, when added to the cost of the new property, to make up $57,700.

It is true, of course, that the contract would not be conclusive as to whether an agency existed if other facts and the surrounding circumstances should indicate that an agency did exist. However, we cannot conclude that the surrounding facts do indicate that the Realty Co. was acting as agent for the petitioner. It is true that the Realty Co. did place a portion of the $60,000 selling price which it had received from the Sunday-school board in a bank account in its name as escrow agent for the petitioner. However, the amount placed in such account was not the full selling price, but amounted to $57,700, less the amounts already expended toward complying with its undertaking to acquire a lot and construct the building. Murphree testified that he customarily, in his business, set up escrow accounts when funds were dedicated to a particular project. We accordingly think this circumstance is not indicative of an agency arrangement. The amount which the Realty Co. originally retained out of the $60,000 selling price was $2,350, which is approximately the difference between $60,000 and $57,000 (which it was required to pay to petitioner in the form of property and cash). In the final analysis, it appears that its profit was only $1,615.20, since it apparently bore some of the taxes and fees with respect to the Sidco property. This circumstance would seem to indicate that the Realty Co. was acting as a principal and not merely receiving an agent's commission. Nor do we think that, under the present circumstances, it is indicative of an agency arrangement that the petitioner approved the invoices for construction which the Realty Co. paid from this account in view of the fact that the agreement was that the Realty Co. would provide a building suitable to the petitioner.

The evidence shows that the representatives of the petitioner made it abundantly clear to the Realty Co. that the petitioner was not interested in effecting a sale of its Berryhill Street property and that the only transaction which it would consider was an exchange of properties, together with "boot." To this end, the agreement was that the petitioner was to retain the use, rent free, of the property until such time as the Realty Co. should provide and transfer to the petitioner another suitable property. Murphree, president of the Realty Co., fully understood the agreement and purported to be acting as a principal in obtaining a lot and constructing a building which he could trade to the petitioner, and he testified that he was not acting as an agent.

We think that the contract and other facts presented are sufficient to establish that the Realty Co. was not acting as agent. There is no basis for assuming that there was some other agreement between the

petitioner and the Realty Co. which would establish an agency relationship. We have accordingly concluded and found as a fact that the Realty Co. was not acting as agent for the petitioner in selling its Berryhill Street property and acquiring and constructing the Sidco property.

As stated, the respondent contends that the transaction cannot be considered as an exchange since the Realty Co. did not own property of like kind to the Berryhill Street property at the time (October 31, 1956) that the petitioner deeded the Berryhill Street property to the Realty Co. It is true, of course, that the Realty Co. did not possess property of a like kind at that time, but as we view the transaction, the transfer on October 31, 1956, was but one of the steps in an integrated transaction which contemplated an exchange of properties of like kind. Since, under the contract, any deed executed by the Realty Co. with respect to the Berryhill Street property was subject to the condition that the petitioner was to retain the use of such property rent free until the Realty Co. should provide a suitable new building, the deed executed by the petitioner on October 31, 1956, and the deed executed by the Realty Co. to the Sunday-school board on the same date had the effect of transferring only legal title to the property. The petitioner in effect retained the beneficial ownership of the property until the new Sidco property was available for its use. Thus the petitioner's transfer of ownership of the Berryhill Street property and the transfer of ownership of the Sidco property to the petitioner were reciprocal and mutually dependent. When, on July 19, 1957, the Sidco property was deeded to the petitioner by the Realty Co., beneficial ownership of the Berryhill Street property passed through the Realty Co. to the Sunday-school board. At that time there was effected, within the meaning of section 1031 of the Code, an exchange by the petitioner of its Berryhill Street property for the Sidco property and money in the amount of $17,055.65.

The transaction was not based solely on money values so as to render it a sale. The statute itself presupposes the fixing of values for the properties in an exchange, since it contemplates that any exchange may involve "boot." The case principally relied upon by the respondent, *Bloomington Coca-Cola Bottling Co.* v. *Commissioner, supra,* is distinguishable. There a contractor agreed to build a new plant for the taxpayer on land owned by the taxpayer and to accept taxpayer's old plant in part payment of the contract price. It was clear that the contractor did not own the other property which, it was claimed, was transferred to the taxpayer in an exchange.

It is our conclusion that the gain realized in 1957 by the petitioner upon the transaction is to be recognized, under section 1031, but only to the extent of the money received in the amount of $17,055.65. It

follows that the respondent erred in his determination that the petitioner received recognizable gain of $54,750.66 in 1956, or alternatively, in 1957.

The petitioner contends that in the taxable year 1952 it had a loss of $14,576.76 on the sale of its Mt. View Corporation stock and a loss of $3,152.20 on the sale of the realty referred to as the Gardner Tract, and that the sum of these two losses, $17,728.96, constituted a net capital loss which it is entitled to carry over and take as a deduction in the taxable year 1957 to the extent provided in sections 165, 1211, and 1212 of the Internal Revenue Code of 1954. The respondent determined that the petitioner sustained no such losses. And therefore the burden of proof was upon the petitioner to adduce evidence that it did in fact sustain the claimed losses in 1952.

Under section 111(a) of the Internal Revenue Code of 1939 the amount of loss upon the disposition of property is the excess of the adjusted basis thereof over the amount realized upon such disposition. Here the amount realized is not in dispute. The question is whether the basis of the Mt. View Corporation stock and the realty sold exceeded the amount realized. The respondent's determination was to the effect that in neither case did the basis exceed the amount realized.

Section 113(a) of the 1939 Code provides in general that the basis of property shall be its cost. Here the petitioner contends that the basis in its hands of the Mt. View Corporation stock was $15,000 because in connection with the acquisition of such stock from its two stockholders in 1946 it canceled a total of $15,000 of its stockholders' indebtedness to it. Similarly, it contends that the basis of the Gardner Tract was $5,000 since it canceled $5,000 of its stockholders' indebtedness to it upon their transfer of such property to it in 1946.

It is true that the corporation purported to have canceled indebtedness in these amounts in consideration of the transfer of these properties to it in 1946. However to determine that the full amounts of indebtedness canceled constituted costs of the properties requires a conclusion that the fair market value of the properties when transferred to the corporation were equal to or in excess of those amounts. If the amount of indebtedness canceled exceeded the fair market value of the properties received, it must be concluded that to the extent of the excess the cancellation was for some purpose other than the purchase of the assets—in the instant case perhaps a purpose to make a distribution. See *Majestic Securities Corporation*, 42 B.T.A. 698, affd. (C.A. 8) 120 F. 2d 12.

The evidence adduced fails to establish the fair market value of the properties in question when they were transferred to the petitioner in 1946.

Apparently the Mt. View Corporation had only one asset, land on Lookout Mountain, which the corporation had never made any attempt to develop. Its sole activity was to hold title to the land and pay taxes thereon. We cannot conclude that the fair market value of the Mt. View stock when acquired by the petitioner in 1946 and hence its basis in its hands, was in excess of $423.24, the amount realized by petitioner on the sale thereof in 1952.

We are not informed as to the price which the petitioner's stockholders had originally paid, prior to 1946, for the Gardner Tract. We do know that the remaining portion of such tract which was transferred to the petitioner in 1946 was sold by the petitioner in 1952 for a net price of $1,847.80. The minutes of the meeting of the directors of the petitioner show that at the time this property was transferred to the petitioner Whaley stated that the property in question had a fair market value of $5,000, and Horn testified that he considered that the fair market value of this property at that time was $5,000. However, no evidence was adduced to support these opinions. Murphree, while not expressing any opinion as to the value of this particular land, stated in general that the value of real estate lots in the area increased between 1946 and 1952. Upon the record we cannot conclude that the fair market value of this remaining portion of the Gardner Tract when acquired by the petitioner in 1946, and hence its basis in petitioner's hands, was greater than $1,847.80, the amount realized by the petitioner on the sale thereof in 1952.

We are constrained to hold that the petitioner has not shown error in the respondent's determination that the petitioner did not sustain a net capital loss in 1952.

*Decisions will be entered under Rule 50.*