EARLENE T. BARKER, PETITIONER v. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 1721–78.     Filed June 10, 1980.

*Earlene T. Barker, pro se.*
*Charles O. Cobb,* for the respondent.

NIMS, *Judge:* Respondent determined a deficiency in taxes of $160 for the year 1973 and $4,824 for the year 1974. After concessions by the parties, there are two issues remaining for our decision:

(1) Should petitioner have recognized gain in 1974 on a transaction in which she disposed of her Demion property and acquired the Casa El Camino property?

(2) Did the buildings located on the petitioner's Casa El Camino property have a useful life of 30 years at the time such property was acquired by petitioner, as determined by respondent?

## FINDINGS OF FACT

Most of the facts were fully stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated by this reference.

The residence of the petitioner at the time the petition was filed in this case was Oceanside, Calif.

In June 1971, the petitioner acquired from Covington Bros., Inc., a parcel of real property, consisting of a four-plex residential building located at 18551 Demion Way, Huntington Beach, Calif. (the Demion property), along with personal property, consisting of furnishings related to the property. Covington Bros., Inc., was a California corporation in the business of buying and selling real estate. The Demion property was held by the petitioner primarily for rent to tenants.

In the spring of 1974, Mr. and Mrs. Goodyear contacted petitioner to inquire about purchasing the Demion property. Petitioner spoke to her accountant, Richard A. Harrison, about setting up a tax-free exchange to dispose of the property. After the contact by the Goodyears, petitioner contacted Covington Bros. and arrangements were made to effect an exchange through Covington Bros. and Grover Escrow Corp. Grover Escrow was handling three parcels of property, lots 15, 16, and 17 of the Casa El Camino subdivision, which were sought by petitioner. Petitioner then told the Goodyears that she would make the Demion property available to them but that the transaction would have to be done as an exchange through Grover Escrow.

To effect these transactions as an exchange, the parties entered into a series of contractual arrangements which took the form of escrow agreements. The intent of the parties was to structure a simultaneous transaction through these escrow agreements and escrow accounts by which Covington Bros. would acquire the Casa El Camino lots and exchange the lots for petitioner's Demion property which Covington Bros. would then sell to Virginia Goodyear. The parties to the various agreements are set forth below:

| Escrow No.— | Seller | Buyer | Property |
|---|---|---|---|
| 4–2863–01 | Barker | Covington | Demion |
| 4–2864–01 | Barker | Goodyear | Demion |
| 4–2861–01 | Covington | Barker | Casa El Camino No. 15 |

| 4–2862–01 | Covington | Barker | Casa El Camino No. 17 |
| 4–2906–01 | Covington | Barker & Bear | Casa El Camino No. 16 |

Escrow No. 4–2863–01, dated April 15, 1974, was established for the transfer of the Demion property from petitioner to Covington Bros. It listed Covington Bros. as the purchaser and petitioner as the seller. The escrow agreement provided, in pertinent part, as follows:

In order to effect an exchange I [Covington Bros.] will hand you [Grover Escrow] a deed to real property [Casa El Camino] described in escrows 4–2861–01 and 4–2862–01 in which, for the purpose of this escrow I have an equity of $17,000.00 and will take title subject to the existing encumbrances.

We, the undersigned buyers [Covington Bros.] agree to accept a deed to real property [Demion] described in this escrow, and we agree to execute a deed affecting this property in favor of _____ and these transactions are to file concurrently herewith.

In the event the equity of the seller, Earlene T. Barker, is greater than $17,000.00, said overage is to be paid to her at the consummation of these transactions, after payment of necessary incurred costs in said escrows and the property conveyed herein.

We, the purchasers herein are not to be at any costs in this transaction, nor in the transactions affecting the transfer of title to the _____ . All costs relating to seller for this transaction is to be paid by Earlene T. Barker.

This escrow involves an exchange of property as set forth herein in escrow 4–2861–01 and 4–2862–01 at Grover Escrow Corporation.

In connection with all documents in these escrows, which are to record concurrently you are instructed to transfer and/or accept funds and/or equities to comply with terms and conditions contained herein.

Escrow 4–2863–01, 4–2861–01 and 4–2862–01 shall be considered as exchange escrows between parties and any wording therein contrary is to be considered null and void.

The successful closing of this transaction is contingent upon the concurrent recording of Escrow 4–2861–01, 4–2862–01 and 4–2864–01.

Escrow No. 4–2864–01, dated April 15, 1974, was established for the transfer of the Demion property to Virginia Goodyear. It listed petitioner as the seller and Virginia Goodyear as the buyer. The escrow agreement provided, in pertinent part, as follows:

Prior to June 3, 1974, I [Goodyear] will hand you [Grover Escrow] $17,000.00 and do hand you now the sum of $300.00 and have handed the seller [Barker] the sum of $200.00 to be deposited into escrow and will cause to be handed you by means of a new conventional loan to file the sum of $68,500.00, making a total consideration in this transaction of $85,700.00 * * *

The successful closing of escrow is subject to buyer [Goodyear] obtaining and qualifying for a new conventional loan to file in favor of Allstate Savings and Loan Association in the principal sum of $68,500.00. Buyers execution of loan documents shall be deemed his approval of all terms and conditions contained therein. You are authorized and instructed to comply with the instructions of the lender of the first trust deed to file and loan funds to be credited herein.

Seller [Barker] to present to escrow, prior to the close, a rental schedule for the purpose of prorations; security money, to be credited the buyer and debited the seller.

Buyer [Goodyear] to pay all costs for the new loan to file. All remaining costs to be paid as follows: Buyer to pay up to but not exceeding the sum of $200.00 with the balance of the costs to be paid for by the seller. Costs of the seller will be paid by the seller in escrow 4-2863-01, which is for the purpose of effecting an exchange.

The successful closing of escrow is contingent upon the concurrent recordings of escrow 4-2863-01, 4-2861-01 and 4-2862-01.

Seller named herein agrees to provide a termite clearance covering subject property from a licensed termite control service which shows no visible signs of termites, dry rot and/or fungus in all accessible area. You are hereby authorized and instructed to pay for this report and any corrective work required, from the net proceeds due seller in this transaction.

Entered as a memorandum only and you as escrow holder are not to be concerned or held liable and/or responsible for same: All heating, plumbing and electrical appliances to be in good working order at the close of escrow.

In the event of cancellation by buyer, buyer understands the $500.00 on deposit is non-refundable.

Three escrows (Nos. 4-2862-01, 4-2861-01, and 4-2906-01) were established for the transfer of the Casa El Camino property (lots 15, 16, and 17) from Covington Bros. to petitioner. Each escrow agreement listed Covington Bros. as the seller and petitioner as the buyer (Jim B. Bears was also a buyer in escrow No. 4-2906-01).

Escrow Nos. 4-2861-01 and 4-2862-01 for lots 15 and 17, dated April 15, 1974, provided in pertinent part as follows:

In order to effect an exchange I [Barker] will hand you [Grover Escrow] a deed to real property described in escrow 4-2863-01 in which I have an equity of $17,000.00, $8500.00 to be applied to escrow 4-2861-01 and $8500.00 to be applied to escrow 4-2862-01 and will execute the necessary papers to reflect a loan of $67,900.00 and will also execute a second purchase money trust deed in favor of seller [Covington Bros.] in the sum of $8500.00, making a total consideration in this transaction of $84,900.00.

This escrow involves an exchange of property [Demion] as set forth herein in escrow 4-2861-01 and 4-2863-01 at Grover Escrow Corporation.

In connection with all documents in these escrows, which are to record concurrently, you are instructed to transfer and/or accept funds and/or

equities to comply with the terms and conditions contained herein. Funds needed to cover purchasers [Barker] closing costs incurred in this transaction to be transferred from funds due seller [Covington Bros.] in escrow 4–2863–01. Escrows 4–2861–01, 4–2862–01 and 4–2863–01 shall be considered as exchange escrows between parties and any wording therein contrary is to be considered null and void.

Successful closing of this transaction is contingent upon concurrent recording of escrow 4–2864–01.

In the event of cancellation, buyer [Barker] to pay a $50.00 cancellation fee to the seller [Covington Bros.], plus any additional costs incurred.

Escrow No. 4–2906–01, for lot 16 dated April 23, 1974, provided, in pertinent part, as follows:

In order to effect an exchange I [Barker] will hand you [Grover Escrow] a deed to real property [Demion] described in escrow 4–2863–01 in which I have an equity of $17,000.00, $8500.00 to be applied to escrow 4–2861–01 and $8500.00 to be applied to escrow 4–2862–01 and any overage in the equity to be applied to escrow 4–2906–01 and will execute the necessary papers to reflect a loan of $67,900.00 and will also execute a second purchase money trust deed in favor of seller in the sum of $8500.00, making a total consideration in this transaction of $84,900.00. Any shortage in equity to be adjusted in the cash through escrow.

The rest of the agreement contained the same terms as the escrow agreements for lots 15 and 17.

Closing was on or about June 10, 1974. After the terms of the escrow agreements were carried out, Virginia Goodyear ended up with title to the Demion property and petitioner ended up with title to the Casa El Camino lots. Documents recorded at the Orange County, Calif., Hall of Records show that the Demion property was first deeded to Covington Bros. and then from Covington Bros. to Goodyear.

Total consideration paid by Virginia Goodyear was $85,700, which included $17,200 cash plus the $68,500 proceeds of a new trust deed taken out by Goodyear on the Demion property.

The proceeds from the sale of the Demion property were applied to satisfy an existing first trust deed on the property of $54,968.17 and a second trust deed on the property of $7,320.62. After other expenses incidental to the sale were satisfied, a total of $20,825.41 was credited on June 10, 1974, to a new escrow account numbered 4–2863–01.

Lots 15, 16, and 17 of the Casa El Camino property were acquired by petitioner on or about June 10, 1974, pursuant to the above escrow agreements. (Lot 16 was acquired by petitioner in a joint venture with Jim B. Bears.)

The consideration for lot 15 of the Casa El Camino property, along with expenses incidental to the acquisition of this property, were paid by means of petitioner's assuming a first trust deed on the property of $67,900, and executing a second trust deed on the property of $8,500 in favor of Covington Bros., and by a transfer of cash from escrow account 4–2863–01 in the amount of $8,756.58 and by petitioner's payment of $300 in cash.

The consideration for lot 17 of the Casa El Camino property, along with expenses incidental to the acquisition of this property, were paid by petitioner's assuming a first trust deed on the property of $67,900, executing a second trust deed in favor of the sellers of $8,500, and by a transfer of cash from escrow account 4–2863–01 in the amount of $8,827.54 and the payment of $300 in cash.

The consideration for lot 16 of the Casa El Camino property was paid by petitioner's and Jim B. Bears' assuming a first trust deed on the property of $67,900, executing a second trust deed on the property in favor of the sellers in the amount of $8,500, and by a transfer of cash from escrow account 4–2863–01 in the amount of $3,191.19 and the payment of cash.

Petitioner incurred expenses of $1,802.18 in disposing of the Demion property. (On brief, respondent conceded that this amount should be added to petitioner's basis in the Demion property.)

In the notice of deficiency, respondent determined that petitioner's disposition of the Demion property was a taxable event. Respondent also determined that the useful life of the Casa El Camino buildings was 30 years and thus disallowed a portion of the depreciation petitioner claimed on the Casa El Camino property on her 1974 income tax return.

## OPINION

This case involves another variant of the multiple-party, like-kind exchange by which the taxpayer, as in this case, seeks to terminate one real estate investment and acquire another real estate investment without recognizing gain. The statutory provision for nonrecognition treatment is section 1031.[1] The

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue, except as otherwise expressly indicated.

touchstone of section 1031, at least in this context, is the requirement that there be an *exchange* of like-kind business or investment properties, as distinguished from a cash sale of property by the taxpayer and a reinvestment of the proceeds in other property.

The "exchange" requirement poses an analytical problem because it runs headlong into the familiar tax law maxim that the substance of a transaction controls over form. In a sense, the substance of a transaction in which the taxpayer sells property and immediately reinvests the proceeds in like-kind property is not much different from the substance of a transaction in which two parcels are exchanged without cash. *Bell Lines, Inc. v. United States*, 480 F.2d 710, 711 (4th Cir. 1973). Yet, if the exchange requirement is to have any significance at all, the perhaps formalistic difference between the two types of transactions must, at least on occasion, engender different results. Accord, *Starker v. United States*, 602 F.2d 1341, 1352 (9th Cir. 1979).

The line between an exchange on the one hand and a nonqualifying sale and reinvestment on the other becomes even less distinct when the person who owns the property sought by the taxpayer is not the same person who wants to acquire the taxpayer's property. This means that multiple parties must be involved in the transaction. In that type of case, a like-kind exchange can be effected only if the person with whom the taxpayer exchanges the property first purchases the property wanted by the taxpayer. This interjection of cash, especially when the person who purchases the property desired by the taxpayer either uses money advanced by the taxpayer or appears to be acting as his agent, or both, makes the analysis that much more difficult.

In the instant case, petitioner faced just such a problem. Virginia Goodyear wanted to acquire petitioner's Demion property, and an unidentified third party owned the Casa El Camino property that petitioner sought to acquire. To effect the exchange, petitioner brought in a fourth party, Covington Bros., Inc., who, in a simultaneous transaction, was supposed to acquire both properties and transfer the Casa El Camino property to petitioner in return for the Demion property and the Demion property to Goodyear for the cash. This cash and the proceeds of new mortgages taken out by petitioner on the Casa El Camino

property was used to compensate the ex-owners of the Casa El Camino property. The contractual arrangements took the form of escrow agreements and the dollars were evened out through escrow accounts.

Petitioner contends that the parties successfully completed a like-kind exchange; respondent contends otherwise, maintaining that petitioner sold the Demion property and reinvested the proceeds in the Casa El Camino property, all of which amounted to a taxable transaction.

We begin by observing that there is nothing inherent in a multiple-party exchange that necessarily acts as a bar to section 1031 treatment. Thus, it is not a bar to section 1031 treatment that the person who desires the taxpayer's property acquires and holds another piece of property only temporarily before exchanging it with the taxpayer. *Mercantile Trust Co. of Baltimore v. Commissioner*, 32 B.T.A. 82 (1935); *Alderson v. Commissioner*, 317 F.2d 790 (9th Cir. 1963), revg. 38 T.C. 215 (1962); *Starker v. United States, supra;* Rev. Rul. 75–291, 1975–2 C.B. 332.[2] Similarly, it is not fatal to section 1031 treatment that the person with whom the taxpayer exchanges his property immediately sells the newly acquired property. *W. D. Haden Co. v. Commissioner*, 165 F.2d 588 (5th Cir. 1948); *Mays v. Campbell*, 246 F. Supp. 375 (N.D. Tex. 1965).

Difficulties arise, however, when the transaction falls short of the paradigm in which transitory ownership is the only feature distinguishing the transaction from two-party exchanges. Still, the courts (and by and large the Commissioner), in reviewing these transactions, have evinced awareness of business and economic exigencies.

Often the taxpayer and a prospective purchaser will enter into an exchange agreement before acceptable like-kind property has been located. In *Alderson v. Commissioner, supra,* as in *Biggs v. Commissioner*, 69 T.C. 905 (1978), on appeal (5th Cir., Oct. 23, 1978), the court approved tax-free exchange treatment since the properties were designated before the date set for transfer of

---

[2]In Rev. Rul. 75–291, 1975–2 C.B. 332, the Commissioner suggests as a caveat to its acceptance of temporary ownership those situations where the person purchasing the property for exchange with the taxpayer was actually acting as the agent for the taxpayer in making the purchase.

taxpayer's property even though the to-be-received properties had not been identified as of the date of the agreement.[3] This aspect of *Alderson* was approved in Rev. Rul. 77–297, 1977–2 C.B. 304, in which the Commissioner also allowed the taxpayer to search for and select the property to be received by him in the exchange. In fact, in *Alderson,* the Ninth Circuit was also satisfied even though originally the taxpayer negotiated a sale and only later amended the escrow agreement to provide for a "three corner" exchange in lieu of a cash sale. See also *Coupe v. Commissioner,* 52 T.C. 394 (1969). Rev. Rul. 77–297 also cited this aspect of *Alderson* with approval.

In *W. D. Haden Co. v. Commissioner,* 165 F.2d 588 (5th Cir. 1948), an individual purchased property from a third party with the intent of exchanging this property for property held by the taxpayer, but the individual never acquired legal title to the property. Despite this, the court sanctioned tax-free exchange treatment, holding that the buyer may direct the third party to deed this property directly to the taxpayer so long as the cash paid to the third party is transferred directly from the buyer to the third party and not through the taxpayer. See also *Biggs v. Commissioner,* 69 T.C. 905 (1978), where this Court sustained tax-free exchange treatment, again notwithstanding the fact that the exchanging party did not obtain legal title to the property to be exchanged.

In *124 Front Street, Inc. v. Commissioner,* 65 T.C. 6 (1975), section 1031 treatment was in order for a taxpayer where a corporation advanced funds to the taxpayer to permit him to exercise an option he held on property. The taxpayer then exchanged the newly acquired property for property held by the corporation. In *Biggs v. Commissioner, supra,* a similar result ensued where the taxpayer advanced funds to a fourth party to enable it to purchase the sought property (the taxpayer ultimately recovering his funds when the several titles closed).

Notwithstanding those deviations from the standard multiple-party exchanges which have received judicial approval, at some point the confluence of some sufficient number of deviations will bring about a taxable result. Whether the cause be economic

---

[3]In *Starker v. United States,* 602 F.2d 1341 (9th Cir. 1979), the Ninth Circuit approved tax-free exchange treatment even though the properties were not even selected until some time after the taxpayer had "exchanged" his property.

and business reality or poor tax planning, prior cases make clear that taxpayers who stray too far run the risk of having their transactions characterized as a sale and reinvestment.

For example, in *Carlton v. United States*, 385 F.2d 238 (5th Cir. 1967), the parties intended to enter into an *Alderson* like-kind exchange (i.e., the person who wanted the taxpayer's property was to temporarily acquire and hold the property wanted by the taxpayer), but to avoid unnecessary duplication in the transfer of money and titles, the third party conveyed his property directly to the taxpayer, and the buyer paid money to the taxpayer, intending that the taxpayer pay this money to the third party. Focusing on the taxpayer's receipt of cash rather than real property, the court held that the transaction was a sale.

In *Rogers v. Commissioner*, 44 T.C. 126 (1965), affd. per curiam 377 F.2d 534 (9th Cir. 1967), the taxpayer granted a purchase option to Standard Oil Co. of California prior to his agreement with third parties to exchange the property subject to the outstanding option. Standard Oil exercised its option and paid the purchase price into escrow just before the exchange was completed. Therefore, the taxpayer was held to have sold his property before the exchange took place, and section 1031 treatment was denied.

It is against this background that the present four-party, like-kind exchange must be analyzed. At the outset, we note that this transaction is earmarked by several factors characteristic of section 1031 exchanges. It is clear that the parties intended that there would be an exchange of the properties. While intent alone is not sufficient (*Carlton v. United States*, 385 F.2d 238 (5th Cir. 1967)), it is relevant to a determination of what transpired. *Biggs v. Commissioner, supra* at 915.

Consonant with this intent, the essence of the agreements among the parties was that petitioner would exchange the Demion property for the Casa El Camino property rather than have petitioner sell the Demion property and reinvest the proceeds. This was accomplished through contractual arrangements which were such that petitioner did not, or could not, obtain actual or constructive receipt of the cash proceeds from the sale of the Demion property to Goodyear.

Each of the contractual arrangements between the parties was a mutually interdependent part of an integrated plan; each

transaction was contingent upon the successful completion of the other transactions; and the transactions were to be completed simultaneously. Under the agreements, moneys paid into escrow were earmarked for the Casa El Camino property; petitioner had no option of taking cash in lieu of this property. Finally, title passage was consistent with the idea that this was an exchange of properties. Title for the Demion property passed from the petitioner to Covington Bros. and then to Goodyear; conversely, title for the Casa El Camino property passed from the initial owner to Covington Bros. and then to petitioner.

There are, however, two features of this transaction which could be construed as suspect under section 1031: Covington Bros.' transitory ownership of the properties and the possibility that petitioner could have received cash rather than real estate.

At first blush, the transitory nature of Covington Bros.' ownership of the Demion property on the one hand and the Casa El Camino property on the other seems to lend itself to a step-transaction argument; that is, Covington Bros.' ownership of the properties could be viewed as nothing more than an unnecessary and formalistic step of no legal or economic significance which should be ignored in determining the character of the transaction for tax purposes. But, as indicated above, the Commissioner accedes to transitory ownership in the three-party context (Rev. Rul. 77-297, *supra* ), and we can perceive no reason why the four-party context should be treated any differently. In other four-party exchanges previously considered by the courts and decided in favor of the taxpayer, the fourth party has held title to the properties for no longer than a transitory period. We do not understand respondent's attack on four-party exchanges to be so broad-based that he thinks none qualify for section 1031 treatment. See *Coupe v. Commissioner, supra; Biggs v. Commissioner, supra.*[4] Indeed, respondent has not made such an argument here. To the complaint that this treatment places undue emphasis on a formalistic step of no substance, we repeat

---

[4]There is no evidence, and respondent has not argued, here, that Covington Bros. was the agent of petitioner, and thus petitioner, through her agent, has purchased the Casa El Camino property. Cf. *Coupe v. Commissioner,* 52 T.C. 394 (1969); *J. H. Baird Publishing Co. v. Commissioner,* 39 T.C. 608 (1962). But see *Biggs v. Commissioner,* 69 T.C. 905 (1978), where this Court sustained a four-party, like-kind exchange after explicitly noting that *no* finding had been made that the fourth party was acting as the agent of the purchaser of the taxpayer's property, rather than as the taxpayer's agent. 69 T.C. at 917.

what we have already said: that the conceptual distinction between an exchange qualifying for section 1031 on the one hand and a sale and reinvestment on the other is largely one of form.

Respondent has chosen to focus his attack on those attributes of this transaction which depart from the standard four-party exchange. Respondent's basic contention is that the agreement providing for the transfer of the Demion property from petitioner to Goodyear is separate and distinct from the agreement providing for the transfer of the Casa El Camino property to petitioner. Respondent's view has it that escrow No. 4-2864-01 between petitioner as seller and Goodyear as buyer obligated petitioner to sell the Demion property to Goodyear upon payment of an appropriate amount of cash into escrow. He contends that petitioner could have taken the cash by paying a $50 penalty, plus costs, after transferring the Demion property to Goodyear and withdrawing from the agreements calling for her to acquire the Casa El Camino property. And respondent views the provision for simultaneous escrow closings on the Demion and Casa El Camino properties as an artifice through which petitioner avoids cash passing through her hands. Respondent draws the conclusion that the transactions should be characterized as a sale and reinvestment of funds which does not qualify as a section 1031 exchange.

The basic weakness in respondent's position is that it treats too cavalierly the language in the escrow agreements providing that the successful closing of each transaction is contingent upon the successful closing of all the other transactions. The mutual interdependence of the Demion and Casa El Camino transfers could not have been made more explicit.[5]

In this context, the fact that the escrow agreement (No. 4-2864-01) providing for the transfer of the Demion property to

---

[5]We emphasize the contractual interdependence of the transfers, not because contractual interdependence is required in a multiple-party exchange, but because it highlights the exchange character of this transaction. In *Biggs v. Commissioner*, 69 T.C. 905 (1978), the Court sustained tax-free exchange treatment, even though there was no contractual interdependence between the transfers of property, because there was mutual dependence; i.e., an integrated plan intended to effect an exchange of like-kind properties. 69 T.C. at 914–915. Contractual interdependence also helps bolster a taxpayer's case when, as here, there is something in one of the agreements inconsistent with exchange treatment.

Goodyear listed Barker rather than Covington as "seller" takes on less significance.[6] Indeed, there is plenty of evidence that Goodyear received the property from Covington Bros. rather than Barker. There was a separate escrow agreement providing for the transfer of the Demion property from Barker to Covington Bros. The escrow ledger for escrow account No. 4–2864–01 listed Covington Bros. as the seller rather than Barker. And at the Hall of Records there was recorded the passage of title from Barker to Covington to Goodyear.

In short, it seems clear that the listing of Barker as seller of the Demion property rather than Covington Bros. was the result of a mistake or sloppiness or both. It is certainly at odds with both the contractual agreements among the parties and the way in which these agreements were carried out. We decline respondent's invitation to find that Goodyear received the Demion property directly from petitioner rather than through Covington Bros.

Respondent has also made too much out of the contract cancellation clause in contending that petitioner had the option of taking either cash or property at the time of the exchange. It is true that petitioner's agreement with Covington Bros. regarding the Casa El Camino property provided that "In the event of cancellation, buyer [is] to pay a $50.00 cancellation fee to the seller, plus any additional costs incurred." But that does not mean that petitioner could simply see the transfer of the Demion property through, then withdraw from the Casa El Camino agreements by paying the penalty, and thereby accomplish the receipt of cash proceeds, as respondent insists. Rather, the mutually interdependent nature of the escrow agreements was such that the cancellation of the agreements was explicitly designed to render the others ineffective if petitioner attempted to take the course suggested by respondent.[7]

Under the Commissioner's administrative position, an ex-

---

[6]Respondent does not argue that the use of the terms "buyer" and "seller" in the escrow agreements, rather than "transferor" and "transferee," in and of itself means that a sale occurred. Rather, respondent's concern is that escrow No. 4–2864–01 seems to provide for a direct transfer of the Demion property from Barker to Goodyear, which is inconsistent with petitioner's argument that the property was transferred from Barker to Covington and then to Goodyear.

[7]If the original agreements were canceled, petitioner could presumably have entered into an entirely new agreement with Goodyear to sell the Demion property directly to Goodyear (for

change can be effected through an escrow account as long as the taxpayer cannot obtain use of the escrow moneys. Rev. Rul. 77–297, *supra*. Since the money paid into escrow here was earmarked for the Casa El Camino property and could never be made available to petitioner under the terms of the escrow agreements, this transaction meets that measure.[8]

Accordingly, we find respondent's contentions without merit and we hold that the transaction in the instant case falls within the ambit of section 1031.

Respondent has an alternative argument which must be addressed since we have found that the transaction qualifies as a like-kind exchange under section 1031. As part of the transaction, and simultaneously with the exchange of the properties, petitioner's mortgage on the Demion property was satisfied, and Goodyear took out a new mortgage on that property. Respondent characterizes the mortgage payment as cash boot to petitioner and contends that section 1031(b)[9] requires petitioner to recognize realized gain up to the amount of the cash used to satisfy the mortgage. To analyze this issue, we must explore the boot and boot-netting rules under section 1031(b).

Money or property other than "like-kind" property received in a section 1031 exchange is taxed as boot under section 1031(b). Furthermore, where property transferred by a taxpayer is subject to a mortgage, the amount of the mortgage is treated as boot received by the taxpayer. Sec. 1.1031(b)–1(c), Income Tax Regs.; *Allen v. Commissioner*, 10 T.C. 413 (1948). The presence of boot in a like-kind exchange does not disqualify the transaction from section 1031 tax-free treatment. Under section 1031(b),

---

cash), but the possibility of receiving cash by canceling one transaction and entering into an entirely new transaction would not, in and of itself, affect the efficacy of a like-kind exchange.

[8]We note that this case is appealable to the Ninth Circuit. In *Starker v. United States*, 602 F.2d 1341 (9th Cir. 1979), the Ninth Circuit found that a transaction qualified as a sec. 1031 exchange even though the agreement permitted the taxpayer to receive cash, rather than property, in exchange for his property, so long as he never received cash and ended up with property.

[9]Sec. 1031(b) provides as follows:

(b) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—If an exchange would be within the provisions of subsection (a), of section 1035(a), of section 1036(a), or of section 1037(a), if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

gain is recognized on the transaction, but only in an amount not in excess of the boot received.[10]

Section 1031(b) speaks in terms of boot received but does not mention boot given.[11] However, the regulations under section 1031 allow the netting of boot in some situations. When there are mortgages on both sides of the exchange, the mortgages are netted and the difference becomes, for the purpose of determining how much gain is to be recognized, the "money or other property" received by the party transferring the property with the larger mortgage. Sec. 1.1031(b)–1(c) and sec. 1.1031(d)–2, examples (1) and (2), Income Tax Regs.

The regulations have limits on netting of boot when the boot on one or both sides of the transaction consists of something other than reciprocal liabilities. While a taxpayer who receives boot by surrendering mortgaged property can offset the boot by any boot given, including cash, a taxpayer who receives consideration in the form of cash to compensate for a difference in net values in the properties (fair market value less mortgage) cannot offset the cash boot by boot given by virtue of receiving mortgaged property. Sec. 1.1031(d)–2, examples (1) and (2), Income Tax Regs.[12]

Thus, a taxpayer who *receives cash* consideration to compensate for a difference in net values must recognize gain realized to the extent of the sum of cash received and the net difference in favor of himself between the mortgage on the property transferred and the mortgage on the property received. *Allen v. Commissioner*, 10 T.C. 413 (1948). Furthermore, he cannot offset the cash boot received by the net of mortgages even if the property he receives has a larger mortgage. Conversely, a taxpayer who *pays cash boot* can use the cash paid to offset the net difference where the mortgage on the property transferred exceeds the mortgage on the property received.[13]

---

[10]This rule can be illustrated as follows: If A exchanges property worth $5,000 and subject to a mortgage of $3,000 for property worth $2,000, A has received $3,000 boot and he must recognize gain realized up to that $3,000.

[11]For purposes of this opinion, we adopt the following terminology: A taxpayer who assumes a liability or accepts property subject to a liability *gives* boot, and a taxpayer whose liability is assumed or who transfers property subject to a liability *receives* boot.

[12]This rule was applied in *Coleman v. Commissioner*, 180 F.2d 758 (8th Cir. 1950), and was made a part of the regulations in 1956. T.D. 6210 (Nov. 6, 1956), 1956–2 C.B. 508, 513.

[13]S. Surrey, W. Warren, P. McDaniel & H. Ault, Federal Income Taxation, Cases and

In the instant case, if petitioner had simply exchanged the Demion property for the Casa El Camino property (and paid money as she did to compensate for the larger net value (fair market value less mortgage) of the Casa El Camino property over the Demion property), it is clear that no gain would be recognized to petitioner under section 1031(b). Petitioner would be viewed as simply having moved her equity in the Demion property (which was subject to mortgages of $62,288.79) to the Casa El Camino property, which was subject to a larger liability, a classic case of no net boot to petitioner under the section 1031 regulations. Any gain realized by petitioner under this posture of the case need not be recognized since she received no cash or net cash equivalent. This result would obtain even if Goodyear then immediately paid off the liability on the Demion property.

This case does not exactly parallel the above scenario, however, because in reality the mortgage on the Demion property was not paid off by Goodyear after the exchange but was paid off contemporaneously with the exchange. On the facts of this case, and for reasons developed *infra*, this distinction is not critical.

A taxpayer is not allowed to offset cash received by boot given in a case where the taxpayer has received two distinct assets—like-kind property (albeit mortgaged) and cash—and the taxpayer has an unfettered right to do with the cash as he pleases. *Coleman v. Commissioner*, 180 F.2d 758 (8th Cir. 1950). In that type of case, the taxpayer can exit the transaction with non-like-kind property—the cash. It seems appropriate to trigger the recognition of gain in those circumstances.

But when liabilities are paid off contemporaneously with the

---

Materials, pp. 873–874 (1972), contains the following illustrative example. which we have paraphrased:

If A exchanged property worth $55,000 but subject to a $20,000 mortgage for B's property worth $65,000 but subject to a $40,000 mortgage and $10,000 cash, A would recognize gain (to extent realized) only to the extent of the $10,000 cash received plus the net of mortgages if the net was favorable to A. Since A is taking subject to a $40,000 mortgage while being relieved of a $20,000 mortgage, the net of mortgages does not result in any boot to A. Thus, gain is recognized to the extent of the $10,000 cash. (Note, however, that if cash and mortgages were netted together, there would be no net boot to A. However, cash *received* cannot be netted against mortgages.)

As for B, gain will be recognized only to the extent of $10,000 (the net of the $40,000 mortgage less the $20,000 mortgage and the $10,000 cash) since the cash *transferred* may be subtracted from the net of mortgages to reduce boot.

exchange, the taxpayer does not obtain dominion and control over the cash, and the taxpayer's net investment in the new like-kind property is no less than his net investment in the old. Indeed, in the instant case, the net effect mandated by the interdependent contractual arrangements among the parties was not simply to maintain petitioner's investment at the same level; her investment—now transferred to the Casa El Camino property—was actually increased since she paid additional money as part of the acquisition price of the Casa El Camino property. Moreover, the agreements among the parties were such that petitioner never received (nor did she ever have the option to receive) non-like-kind property, i.e., unfettered cash. Conceptually, then, there is no reason that boot-netting should not be permitted in such situations, and we think it proper to allow it. It follows under this approach that petitioner will be permitted to offset the Demion and Casa El Camino liabilities in determining net boot.

Respondent would answer that we have framed the issue incorrectly and that this contemporaneous transaction should be analyzed as if petitioner received the cash and paid off the liability on the Demion property *prior* to transferring that property. Even if we were convinced this characterization were appropriate, we think the same result would obtain. It is significant in this regard that the cash in the instant case was used to satisfy the liability on the property that the petitioner *transferred* (the Demion property) and that the petitioner was contractually bound to use the cash for that purpose. Under no circumstance would petitioner have been able to come away from the transaction with non-like-kind property in the form of cash. Moreover, the receipt of cash and satisfaction of the liability on the Demion property did not compensate petitioner for a larger net value (fair market value less mortgage) of the Demion property over the Casa El Camino property. The payment, standing alone, also would not enhance petitioner's wealth at all—prior to the exchange, to the extent one liability has been satisfied, petitioner has a corresponding obligation to the payor of the cash. In a sense, petitioner was little more than a conduit for the moneys used to pay off the mortgage on the Demion property, and she had no option to put the moneys to other use. Under this approach, since petitioner does not really

benefit until the properties are exchanged, we would still find that petitioner could offset all boot received by boot given.

In essence, this is the thrust of *Commissioner v. North Shore Bus Co.*, 143 F.2d 114 (2d Cir. 1944), affg. a Tax Court Memorandum Opinion, the reasoning of which we adopt in this case. That case involved an exchange of old buses for new buses. Prior to transferring the old buses, the taxpayer received a sum of cash from the owner of the new buses to pay off an outstanding mortgage on the old buses. Taxpayer was obligated under the contract to use the cash for that purpose. The Second Circuit refused to characterize the payment as cash boot. Rather, it viewed the transaction as one in which the taxpayer either simply changed creditors (from the bank to the bus company) or acted as a conduit for the funds.

Accordingly, we hold that boot-netting is permissible in a case where, contemporaneously with the exchange of properties and where clearly required by the contractual arrangement between the parties, cash is advanced by the transferee (in this case, Goodyear through Covington Bros.) to enable the transferor-taxpayer (petitioner) to pay off a mortgage on the property to be transferred by the taxpayer (here, the Demion property). Since these criteria have been met, we find that the exchange in this case was completely tax free to petitioner.

We hasten to add that there is nothing in this analysis that is inconsistent with, or casts doubt upon, the regulations under section 1031 or the holding in *Coleman v. Commissioner, supra.* The boot-netting precept stated earlier, that cash consideration *received* cannot be offset by liabilities assumed, does not appear in the regulations as a broadly stated principle; rather, the rule arises in the context of regulation examples under sec. 1.1031(d)–2, Income Tax Regs. There are factual differences between the regulation examples and this case that go to the essence of the boot-netting principles.

In *Coleman* and in those examples, the cash was paid to the taxpayer to compensate him for a difference in net values (fair market value less mortgage) in the properties exchanged and to enable him to pay off (or to compensate him for assuming) the mortgage on the property he was to *receive*. Where cash boot is paid to account for differences in net values in the properties, the taxpayer has received non-like-kind property—the cash—which he is free to dispose of as he wishes. He may, but need not,

use the money to pay off the mortgage on the property he has received. This is the key factor which distinguishes *Coleman* and the examples in the regulations from the case before us.

The second issue concerns the useful life of the buildings on the Casa El Camino lots. Each of these buildings was new. Respondent determined that the useful life for these buildings was 30 years and adjusted the depreciation deduction accordingly. At trial, petitioner introduced no evidence regarding the useful life of these buildings. Accordingly, respondent's determination is sustained. Rule 142(a), Tax Court Rules of Practice and Procedure.

*Decision will be entered under Rule 155.*

