147 T.C. No. 5

UNITED STATES TAX COURT

ESTATE OF GEORGE H. BARTELL, JR. DECEASED, GEORGE DAVID
BARTELL AND JEAN LOUISE BARTELL BARBER, CO-PERSONAL
REPRESENTATIVES AND ESTATE OF ELIZABETH BARTELL,
DECEASED, GEORGE DAVID BARTELL AND JEAN LOUISE BARTELL
BARBER, CO-PERSONAL REPRESENTATIVES, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 22709-05, 22829-05,          Filed August 10, 2016.
            22891-05.

In 1999, BD, a drugstore chain, entered into an agreement to purchase property L from a third party. In anticipation of structuring an exchange transaction under I.R.C. sec. 1031 to facilitate acquisition of L, BD later assigned its rights in the purchase agreement to third-party exchange facilitator EPC and entered a further agreement with EPC. That second agreement provided for EPC to purchase L and for BD to have a right to acquire L from EPC for a stated period and price. EPC so purchased L on August 1, 2000, with bank

---

[1]Cases of the following petitioners are consolidated herewith: George D. and June M. Bartell, docket No. 22829-05, and David H. and Jean B. Barber, docket No. 22891-05.

financing guaranteed by BD, acquiring title to L at that time. BD then managed the construction of a drugstore on L using proceeds from the aforementioned financing and, upon substantial completion of the construction in June 2001, leased the store from EPC from that time until title to L was transferred from EPC to BD on December 31, 2001.

In late 2001, BD contracted to sell its existing property E to a fourth party. BD next entered an exchange agreement with intermediary SS and assigned to SS its rights under the sale agreement and under the earlier agreement with EPC. SS sold E, applied the proceeds of that sale to the acquisition of L, and had the title to L transferred to BD on December 31, 2001.

Held: BD's disposition of E and acquisition of L in 2001 qualifies for nonrecognition treatment pursuant to I.R.C. sec. 1031 as a like-kind exchange, as EPC is treated as the owner of L during the period it held title to the property. Alderson v. Commissioner, 317 F.2d 790 (9th Cir. 1963), rev'g 38 T.C. 215 (1962), and Biggs v. Commissioner, 69 T.C. 905 (1978), aff'd, 632 F.2d 1171 (5th Cir. 1980), followed.

Robert J. Chicoine and John Mark Colvin, for petitioners.

Ilesa B. McAuliffe and William A. McCarthy, for respondent.

GALE, Judge: Respondent determined the following deficiencies and penalties with respect to petitioners' Federal income tax:

| Petitioners | Year | Deficiency |
|---|---|---|
| Estate of George H. Bartell, Jr., etc. | 2001 | $231,001 |
| George D. and June M. Bartell | 2001 | 167,898 |
| | 2002 | 14,216 |
| David H. and Jean B. Barber | 2001 | 49,604 |
| | 2002 | 19,707 |
| | 2003 | 5,091 |

These cases have been consolidated for purposes of trial, briefing, and opinion. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The principal issue for decision is whether a property transaction undertaken by the Bartell Drug Co. (Bartell Drug), an S corporation owned by petitioners, qualified for nonrecognition treatment pursuant to section 1031 as a like-kind exchange.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations, with accompanying exhibits, are incorporated herein by this reference. At the time the petitions were filed, all petitioners were residents of Washington State.

_____

[2]Final disposition of petitioners' request for a protective order under Rule 103 and an evidentiary dispute are the subject of separate orders.

Petitioners and Bartell Drug

Bartell Drug owned and operated a chain of retail drugstores during the years at issue and had been doing so in Seattle, Washington, and surrounding areas for more than 100 years. Ownership of the company has remained in the Bartell family since its founding in 1890. During the years at issue, all shares in Bartell Drug were held by petitioners George H. Bartell, Jr.,[3] and his two children George D. Bartell and Jean B. Barber.

The foregoing family members served on the company's board of directors in various capacities and as officers during the period under consideration. Jean B. Barber (sometimes Jean Barber) served as chief financial officer of Bartell Drug, as well as secretary and a director on the board throughout that period.

In conducting its retail business, Bartell Drug owned some of the properties in which its stores operated and leased others. Before the 1980s, most of Bartell Drug's stores were in shopping centers anchored by grocery stores, generally in a strip-mall format with the drugstore space sited between two other merchants. Developers of those centers would typically approach Bartell Drug, offering space in an already-planned complex.

---

[3]George H. Bartell, Jr., died in early 2009 after the filing of the case at docket No. 22709-05. His estate was substituted as a party-petitioner.

In the ensuing decades, however, two key, and to some degree interrelated, developments affected the business model for retail drugstores. First, grocery stores began including pharmacies within their stores. That innovation both reduced the attractiveness of the grocery-anchored centers for competing drugstores and prompted grocery stores to have developers restrict leasing to such competitive merchants. Second, Walgreen Co. (Walgreens), a national drugstore chain, introduced on a massive scale and to notable success a store format that shifted the paradigm for drug retailing. The emphasis became freestanding corner locations with drive-through pharmacies. Walgreens entered the Seattle area market in the early to mid-1990s, at which point Bartell Drug came under increasing pressure. The national chains Walgreens, Rite Aid Corp., and Safeway, Inc., became increasingly influential and Bartell Drug's chief competitors in the market.

Given the foregoing, Bartell Drug management faced the prospect of the growing obsolescence of its retail locations and sought to formulate a strategy to update its portfolio of owned and leased properties. The changed business climate generally required Bartell Drug to undertake development of new sites itself in order to open freestanding stores. Such a project often necessitated a significantly greater financial commitment, frequently encompassing land acquisition and/or

building construction costs, than that involved in merely occupying a space built by a third-party developer. Additionally, the properties owned by Bartell Drug at that juncture generally had very low bases, such that outright sale could produce significant taxable gain.

In the early to mid-1990s, Jean Barber was introduced to the concept of section 1031 exchanges through her husband, a real estate broker. Following further investigation and consultation with professional advisers, the Bartell Drug board of directors adopted as a policy and authorized management to pursue a strategy of employing section 1031 exchanges to update the company's real estate portfolio and acquire new store locations. That decision was made in 1998 and was followed by four such exchanges.

In executing the section 1031 exchanges, Bartell Drug worked with Section 1031 Services, Inc., a corporation that provided qualified intermediary services to taxpayers, and a related corporation, Exchange Structures, Inc. Exchange Structures, in turn, set up wholly owned limited liability companies to serve as exchange intermediaries in such transactions. One such limited liability company was EPC Two, LLC (EPC Two), a Washington State entity having Exchange Structures as its sole member. As discussed hereinafter, EPC Two served as the exchange intermediary in the transaction at issue.

Agreement To Purchase the Lynnwood Property

Bartell Drug had operated a small store in Lynnwood, Washington, since the mid-1980s. That store was in a poorly maintained strip mall. By 1999 only a few years remained on the existing lease for the Lynnwood store, and Bartell Drug was interested in considering other properties. The company's real estate manager began looking into potential sites. At the time, it was rumored that Walgreens was also scouting locations in the Lynnwood area, one of which was likewise attractive to Bartell Drug.

That property was a recycling center, owned by Mildred M. Horton,[4] across the street from Bartell Drug's existing Lynnwood store. On April 1, 1999, Bartell Drug's real estate manager had an initial meeting with Mildred Horton and her attorney regarding the property. Further negotiations followed, and as they proceeded Bartell Drug ordered a first commitment for title insurance for the site (hereinafter the Lynnwood property), effective April 21, 1999. The commitment identified Mildred Horton as "Seller" and Bartell Drug as "Buyer/Borrower" and "Proposed Insured". Bartell Drug also contacted an engineering firm about

---

[4]Mildred M. Horton owned the property both in her individual capacity and as trustee of a testamentary trust established under her deceased husband's will. For simplification, Mildred M. Horton and Mildred M. Horton, Trustee, will be referred to, without distinction, as Mildred Horton.

providing a boundary and topographic survey of the Lynnwood property, and the

firm responded with a proposal dated April 23, 1999.

The sale negotiations culminated on May 7, 1999, with the execution by

Mildred Horton as "Seller" and Bartell Drug as "Buyer" of a Real Estate Purchase

and Sale Agreement (sale agreement). The sale agreement recited a total purchase

price of $1,898,640, payable in cash at closing, and set forth a closing date of

August 1, 2000. In addition, the sale agreement specified a series of steps and

deadlines to occur in the interim, relating to due diligence, title, survey,

inspections, and environmental reports, as well as requirements for periodic

earnest money payments totaling $100,000 to be deposited by Bartell Drug in

escrow. The sale agreement also contained the following clause:

> 14.5 <u>Section 1031 Exchange</u>. Buyer and Seller agree to reasonably cooperate with each other to accomplish any exchange under Section 1031 of the Internal Revenue Code, including permitting assignment of this Agreement to an exchange facilitator; provided that the cooperating party is put to no liability or expense in connection therewith.

After execution of the sale agreement, Bartell Drug began to undertake the

steps contemplated therein and related actions aimed at finalizing the acquisition

and construction of a drugstore on the Lynnwood property. Bartell Drug ordered a

second commitment for title insurance effective May 18, 1999, that modified

certain listed exceptions not pertinent here. In July 1999 Mildred Horton and Bartell Drug agreed to extend the period for the company to complete its inspection of the Lynnwood property, so as to allow sufficient time for refining building and site plans. Then, as the extended inspection period drew to a close, Bartell Drug began remission of the stipulated earnest money payments by six checks dated September 1, 1999, through January 31, 2000.

Bartell Drug likewise continued preparations for the construction of a drugstore on the Lynnwood property. On January 5, 2000, Bartell Drug applied to the City of Lynnwood for a building permit for the site. That application listed Bartell Drug as applicant and Mildred Horton as owner of the subject real estate. Bartell Drug also engaged a traffic engineering firm to perform a traffic study and review of site access, and that firm invoiced Bartell Drug for the work on February 15, 2000.

Structuring and Financing the Lynnwood Property Purchase

Meanwhile, Bartell Drug sought to progress on structuring and financing the sale transaction. At some point not clearly disclosed in the record, but before March 2000, Bartell Drug approached Section 1031 Services about the possibility of employing an exchange in connection with the Lynnwood property. At that time, the company anticipated relinquishing an older store in White Center, in

King County, Washington, for the exchange. By March of 2000 it had been agreed that EPC Two would take title to the Lynnwood property with a view to effecting a section 1031 exchange. Simultaneously, Bartell Drug had been working with KeyBank National Association (KeyBank) in structuring a multi-component credit package pertaining to both new borrowing facilities and extensions or renewals of existing loans, totaling approximately $15 million. One component of that package was a $4 million facility identified as a transaction loan intended to finance the acquisition of land for and construction of the new store in Lynnwood. The package was approved by KeyBank on February 29, 2000.

KeyBank's commitment letter for the full package, dated March 1, 2000, and sent to Bartell Drug, described the borrower of the $4 million loan as "The Bartell Drug Company or an entity such as EPC TWO LLC acceptable to the bank with a guaranty provided by The Bartell Drug Company" and the purpose as "to finance the acquisition of land and construction of a new store in Lynnwood, WA. under the benefits of 1031 tax-free exchange." The commitment letter conditioned the financing in the full package upon Bartell Drug's covenant to maintain a tangible net worth of not less than $50 million. KeyBank made an exception to its general loan policy in extending the financing without Bartell Drug having to

provide an audited financial statement. Instead, KeyBank was willing to make the loan on the basis of Bartell Drug's financial strength, long operating history, management team, and name recognition. The loan was not secured.

On March 13, 2000, the Bartell Drug board of directors authorized management to proceed in obtaining the facilities, and Jean Barber countersigned the commitment letter on that date. EPC Two, in turn, on March 17, 2000 (in conjunction with the loan documentation detailed infra), executed a limited liability company borrowing resolution authorizing the entity to borrow from and to sign promissory notes in favor of KeyBank.

On March 17, 2000, KeyBank as "Lender" and EPC Two by Exchange Structures, its sole member, as "Borrower" executed a Business Loan Agreement in the principal amount of $4 million. The loan was structured as a line of credit and required that a guaranty by Bartell Drug be furnished before the disbursement of any loan proceeds. EPC Two simultaneously executed in favor of KeyBank a promissory note in the principal amount of $4 million and three London Interbank Offered Rate addenda designating the pertinent variable interest rate schedule, as well as a disbursement request and authorization for the funds. The disbursement request recited the specific purpose of the loan as being to "finance construction of new store in Lynnwood". At the same time, Bartell Drug signed a corporate

resolution to guarantee and corresponding commercial guaranty of the $4 million note made by EPC Two.

On April 4, 2000, Section 1031 Services sent to Bartell Drug an engagement letter for performance of intermediary services in connection with the section 1031 exchange contemplated for the Lynnwood property. Likewise, on the same date EPC Two sent an engagement letter for performance of "reverse warehousing" services for the exchange. The letters generally discussed fees, transactional agreements and documents, financing, and escrow procedures, with the EPC Two letter advising in particular:

> 2. We take title to the Replacement Property with funds loaned by you and/or a third party lender obtained by you. **Any loan to us from a third party lender must be non recourse to us, although you may personally guarantee the loan.** We provide you with a non recourse note and deed of trust to secure your loan to us. We lease the Replacement Property to you during the warehouse period. You are required under the lease to obtain liability and property insurance, naming us as "additional insured", to pay the property taxes, and to loan us any funds necessary to make mortgage payments.

The basic intermediary fee for a standard two-property exchange was set at $1,500, and 0.5% of the value of the property was specified as the charge for warehousing in a reverse exchange. Under cover of a letter dated April 17, 2000, Bartell Drug returned the countersigned engagement letter. That letter read:

Enclosed are the executed warehousing and exchange letters.  I have talked to Key Bank and they have no problem with issuing a side letter to make the new loan non-recourse to EPC II.  However, the bank cannot do this until they receive an executed copy of the Exchange and Cooperation Agreement.  I have talked to Dan Pepple, our attorney, and asked him to draft this document.  Once we have that document completed, I will contact Key Bank to get the Loan Agreement modified.

As preparations for closing on the Lynnwood property proceeded, a corporate resolution dated July 13, 2000, was executed in which it was represented that the Bartell Drug board of directors in a previous meeting held March 13, 2000, had resolved, inter alia:  (1) to enter into a section 1031 exchange transaction with Section 1031 Services to result in the purchase of a retail drugstore in Lynnwood, Washington, and (2) to assign Bartell Drug's rights under the May 7, 1999, sale agreement with Mildred Horton to Section 1031 Services. On July 26, 2000, EPC Two sent to the title insurance company escrow instructions concerning, and various documents to be executed by the parties in connection with, the closing.

During 2000 and 2001, EPC Two was a single purpose entity formed for the exclusive purpose of providing services to Bartell Drug.  It was a disregarded entity for Federal income tax purposes at all times relevant to these cases (its sole member being Exchange Services, Inc.), and it had no assets during 2000 and

2001 other than, as more fully discussed hereinafter, a right to acquire the Lynnwood property and then title to the Lynnwood property, subject to various contractual terms governing the property's disposition.

Real Estate Acquisition and Exchange Cooperation Agreement

On July 31, 2000, Bartell Drug and EPC Two entered into a Real Estate Acquisition and Exchange Cooperation Agreement (REAECA) with respect to the Lynnwood transaction. Through the REAECA, Bartell Drug and EPC Two (referred to as SPE in the REAECA) contracted to cooperate in effecting an exchange of current property (i.e., property currently owned by Bartell Drug but to be relinquished) for replacement property. The document set forth the contracting parties' rights and responsibilities in that endeavor. The current property was identified as of that time as the White Center site, and the replacement property as the new Lynnwood property. The REAECA addressed acquisition and ownership of the replacement property, including assignment of the existing purchase agreement, financing, construction of improvements, and leasing; disposition of the current property through cooperation in an exchange via a qualified intermediary (i.e., Section 1031 Services); and transfer of the replacement property to Bartell Drug, including the purchase price attendant thereto.

As regards acquisition of the Lynnwood property, Bartell Drug assigned and EPC Two accepted the rights and obligations under the May 7, 1999, sale agreement with Mildred Horton. The REAECA then specified that EPC Two "shall acquire title to" the replacement property and then "shall cause to be constructed on" the replacement property certain improvements "pursuant to plans and specifications approved by Bartell and undertaken by a general contractor and subcontractors approved by Bartell".

To that end, the REAECA provided that to finance the acquisition of and construction of the improvements to the site, EPC Two would borrow funds from an agreed lender and would have no obligation to become liable for any payments or to advance any funds in excess of those so borrowed or funds supplied by the qualified intermediary from the sale of the current property. Similarly, EPC Two was to have no responsibility: (1) "to investigate, review or otherwise inquire into the nature of any work for which payment is requested, it being expressly agreed that SPE's responsibility is solely to disburse funds on request by Bartell"; or (2) "to review, supervise, inspect or otherwise become involved in the construction" of the improvements.

The REAECA also stipulated that upon substantial completion of the improvements, EPC Two was required to lease the replacement property to Bartell

Drug. The lease was to be a triple net lease and was to "provide for rental equal to all debt service payable under any and all" loan agreements with respect to the replacement property.

If Bartell Drug then elected to go forward with an exchange of the current property, that property would be sold to a third party through the qualified intermediary, with the intermediary having been assigned Bartell Drug's rights under such a sale contract and receiving the proceeds thereof. Bartell Drug would next assign to the qualified intermediary its rights and obligations under the REAECA, which included a right to acquire the replacement property. At Bartell Drug's direction, the qualified intermediary would then remit to EPC Two the proceeds from the sale of the current property up to an amount not in excess of the "Purchase Price" of the replacement property. To complete the exchange, the qualified intermediary would direct EPC Two to deed the replacement property to Bartell Drug.

Per the REAECA, the "Purchase Price" for the replacement property was equal to its "Fair Market Value". "Fair Market Value", in turn, was defined:

> "Fair Market Value" of the Replacement Property shall mean the fair market value determined by an appraisal conducted by a nationally recognized real estate appraiser as may be agreed to by Bartell and SPE * * * ; provided, however, that if the Replacement Property is purchased from SPE within twenty-four (24) months after the date on

which SPE acquired the Replacement Property, then the "Fair Market Value" shall be deemed to equal its "Acquisition Cost" as hereinafter defined.

The referenced definition of "Acquisition Cost" followed:

"Acquisition Cost" shall mean the sum of (i) the purchase price paid by SPE to the Seller to acquire the Replacement Property; (ii) all sales, transfer or similar taxes, and all charges and closing costs paid by SPE in connection with its purchase of the Replacement Property; (iii) all interest and stated fees (including pre-payment fees in connection with mandatory pre-payments) under the Credit Agreements which are not paid as rent pursuant to the Lease, (iv) the cost of construction of all Improvements which are paid by SPE, and (v) any and all unreimbursed costs, liabilities and expenses of any kind incurred by SPE in connection with the acquisition, ownership and operation of the Replacement Property and the completion of the Exchange except for "Excluded Costs" as defined * * *

The REAECA additionally incorporated EPC Two's entitlement to receive from Bartell Drug the .5% fee set forth in the previously described April 4, 2000, letter from EPC Two.

Two indemnity provisions were set forth in the REAECA. One was a general indemnification clause whereby Bartell Drug agreed to indemnify and save EPC Two and/or KeyBank "harmless from all loss, cost, damages, expenses and attorneys' fees suffered or incurred" as a result of any claim, investigation, proceeding, or suit in connection with the ownership or exchange of the replacement property "except to the extent * * * [that party] is liable for such loss

as a result of its gross negligence, willful misconduct or breach of its obligations under" the REAECA. The other provision was a specific environmental release and indemnity mandating that Bartell Drug indemnify and hold harmless EPC Two and/or KeyBank for any claims in connection with contamination of the current and replacement properties by any hazardous substance.

Other matters pertaining to security were likewise documented during this period. Contemporaneously with entry into the REAECA, EPC Two on July 31, 2000, executed a deed of trust on the Lynnwood property for the benefit of Bartell Drug. The deed of trust secured Bartell Drug with respect to EPC Two's obligations under the REAECA, which was expressly referenced therein, as well as any liability paid by Bartell Drug under the provisions of its guaranty of payment on the KeyBank loan. Effective August 1, 2000, KeyBank as "Lender" and EPC Two as "Borrower" executed an amendment to the $4 million promissory note. The amendment rendered the note "expressly nonrecourse to Borrower" and stipulated that all payments thereunder were to be made "only from the income and proceeds from the Borrower's interest in the Replacement Property and Improvements to be acquired with the proceeds of the loans(s) evidenced by the Promissory Note".

## Closing on the Lynnwood Property

Closing on the Lynnwood property took place on August 1, 2000. The final selling price, incorporating any pertinent amendments to the May 7, 1999, contract, was $1,878,640.[5] Various other charges and expenses were also settled through the escrow process, and EPC Two received out of the escrow $9,493 in payment of a "Warehousing Lease Fee".[6] On that date, a statutory warranty deed conveying the Lynnwood property from grantor Mildred Horton to grantee EPC Two was recorded. The deed of trust on the property from EPC Two in favor of Bartell Drug was also recorded on August 1, 2000. A final title insurance policy on a fee simple interest in the Lynnwood property, dated August 1, 2000, was issued to EPC Two as the named insured.

## Construction of the Lynnwood Store

Work on the new property itself advanced on August 1, 2000, with the commencement of site demolition and the clearing of existing site debris. J.R. Abbott Construction, Inc. (J.R. Abbott), invoiced Bartell Drug for the demolition

---

[5]The $20,000 reduction in the sale price from the amount stated in the May 7, 1999, sale agreement apparently resulted from an addendum to the sale agreement sought by Mildred Horton pertaining to the removal of personal property from the site.

[6]This $9,493.20 payment equals 0.5% of the original $1,898,640 contract purchase price for the Lynnwood property.

and clearing on August 31, 2000, and Bartell Drug paid directly the $61,690.23 due in early September of 2000. Bartell Drug was subsequently reimbursed that amount through a construction draw from the KeyBank loan. As the project moved into the phase of store construction, Bartell Drug managed the process. For instance, throughout the following months Bartell Drug was engaged in applying for and obtaining appropriate permits and bonding to enable the work to proceed. In September of 2000, Bartell Drug applied to the City of Lynnwood for a public works permit. On December 20, 2000, the City of Lynnwood issued to Bartell Drug the building permit which had been applied for in January of that year, as noted supra.[7]

Performance bonds were required by the City of Lynnwood for the construction of the drugstore. EPC Two executed two commercial surety bond applications dated January 5, 2001, in favor of the City of Lynnwood. Bartell Drug signed those applications as third-party indemnitor. Two performance bonds were issued for the construction listing "EPC TWO, LLC c/o BARTELL DRUG COMPANY" as "Principal" and Travelers Casualty and Security Company of

---

[7]All permits issued by the City of Lynnwood in the record list Bartell Drug as "Applicant" and Mildred Horton as "Owner", regardless of the date of application and/or approval.

America as "Surety" and were signed on January 8, 2001, only by Bartell Drug and filed with the City of Lynnwood.[8]

Bartell Drug selected J.R. Abbott, the same firm that had performed the demolition, as the contractor for the construction. A contract for the work on the new drugstore dated January 8, 2001, was executed between "EPC Two L.L.C. c/o THE BARTELL DRUG COMPANY" as "Owner" and J.R. Abbott as "Contractor". Both EPC Two and Bartell Drug signed the document via signature blocks labeled "OWNER". All requisite building and similar permits for construction of the drugstore were issued to Bartell Drug.

One key component of the drugstore project was site access. Bartell Drug believed that having two driveway access points was critical, but applicable governmental regulations would have limited the Lynnwood property to one curb cut. Accordingly, Bartell Drug worked closely with the City of Lynnwood to formulate an easement plan involving the drugstore site and the adjacent corner lot. Those negotiations culminated in an Agreement for Joint Access Agreement [sic] dated June 15, 2001, between EPC Two and Bartell Drug as grantors and the City of Lynnwood as grantee. The agreement opened with the following recitals:

---

[8]A performance bond prepared previously, dated December 28, 2000, and listing Bartell Drug as "Principal" was apparently not in proper form and not relied upon to meet the bonding obligation for the Lynnwood site.

A.    EPC Two LLC holds title to the real property (the "<u>Bartell Parcel</u>") * * * and The Bartell Drug Company holds the beneficial interest in the Bartell Parcel.  Bartell applied to the City for a building permit to develop the Bartell Parcel.

B.    As a condition to the issuance of a building permit, the City required Bartell to agree to grant access easements in favor of the adjacent parcel * * *

The agreement then went on to describe the subject easements and was executed by both EPC Two and Bartell Drug.

As construction progressed, periodic payments for the work were typically made in the following manner:  (1) J.R. Abbott would send an invoice to Bartell Drug; (2) a Bartell Drug employee would send written authorization to EPC Two for requesting a construction draw from the KeyBank loan in the amount of the invoice; (3) EPC Two would send written authorization to KeyBank for disbursement of funds from the construction loan to be paid by wire transfer to J.R. Abbott; (4) KeyBank would pay J.R. Abbott the amount specified in the EPC Two authorization.  During the period from February through July 2001, six such payments were made.  Various other expenses, including those incurred after the $4 million loan was depleted, were paid by Bartell Drug directly.  A promissory note dated July 6, 2001, was executed by EPC Two in favor of Bartell Drug in the amount of $248,562.33, with respect to at least a portion of the expenses so paid.

The note bore no interest for the first 180 days, and thereafter was to bear interest at 7% per annum.

Completion and Leasing of the Lynnwood Store

As the construction phase came to a close, EPC Two as landlord and Bartell Drug as tenant entered a lease agreement for the Lynnwood property and new store effective July 11, 2001. The lease term was for 24 months beginning June 1, 2001. The rent obligation was summarized at the outset of the lease as follows:

> The initial net rent of the Lease shall be $9,493.00, which has been previously paid by Tenant. As of the Commence Date, net monthly rent shall be $2,000.00 per month, with a total net rent under the lease not to exceed $19,413.00. "Net" rent shall mean the amount of rent owing by Tenant after offsets for any interest owed by Landlord to Tenant related to the Premises. * * *

Subsequent provisions set forth further details, e.g.:

> Tenant may offset the rent owing with payments due Tenant under that certain Note payable by Landlord to Tenant of even date herewith. Tenant shall also be responsible for payment of all utilities, taxes and insurance of the Premises, as set forth below. As additional Rent, Tenant shall make all payments due from Landlord on the Loan secured by the Premises to the applicable lender. * * *

The $19,413 amount had been explained by an EPC Two officer in a facsimile accompanying transmission of a draft of the lease with the comment: "The $19,413 'cap' is .5% of the $2,004,066.96 spent on Lynnwood to date plus its acquisition cost of $1,878,640."

Consistent with the REAECA, the lease also incorporated indemnification clauses in favor of EPC Two, one general and one specifically focused on environmental hazards. In the former, tenant agreed to hold landlord harmless against all liabilities arising from acts or omissions of tenant or visitors to the premises. In the latter, tenant undertook to indemnify landlord against all claims related to hazardous materials brought to or used on the premises.

On July 18, 2001, the City of Lynnwood issued a certificate of occupancy for the new Bartell drugstore. In August of 2001, J.R. Abbott sent to Bartell Drug an application and certification for payment for $93,744.05 remaining due on the project. A conditional release and waiver of lien rights for the project, such as any applicable mechanic's or similar lien, contingent upon payment of the $93,744.05, was included with the invoice. Bartell Drug paid the requested amount by check dated August 24, 2001.

Agreement To Sell the Everett Property

Meanwhile, Bartell Drug was also proceeding with steps directed toward the property to be relinquished in the exchange. In August 2000 Bartell Drug had acquired a retail drugstore in Everett, Washington (Everett property), as part of a section 1031 exchange involving the sale of another property. That transaction was accomplished through Section 1031 Services, and a statutory warranty deed

from EPC Two to Bartell Drug was recorded on December 27, 2000. In the spring of 2001, Jean Barber requested from KeyBank a six-month extension on the term of the $4 million Lynnwood property loan (otherwise expiring May 15, 2015). KeyBank documentation explaining the request, prepared May 15, 2001, stated:

> [T]he new Lynnwood store under construction, and which is being financed by this loan, is now approximately 80% completed and will not be finished and ready for customers until the month of July. In addition, management needs extra time after completion of the Lynnwood Store to determine the most appropriate repayment source - either from sale/leaseback of the company's White Center Store as originally planned or from the sale of the existing Everett Store, which may or may not be leased back depending on management's negotiations on acquisition of a new Everett Store site. The new maturity date of this loan will afford management more than adequate time to make the best economic and strategic decision for repayment.
>
> Bartell's continues to produce excellent financial results. For the year 2000, * * *

The request was approved, and a modification agreement of the KeyBank loan, dated May 16, 2001, was executed by EPC Two.

On or about September 21, 2001, Bartell Drug entered into a purchase agreement to sell the Everett property to William and Theresa Eng. The transaction was structured as a sale-leaseback, and after a series of amendments negotiated between Bartell Drug and the Engs during September and October, the selling price was stipulated at $4,300,250. Among other provisions, the purchase

agreement included a seller exchange clause stating: "Buyer agrees to cooperate should Seller elect to sell the property as part of a like-kind exchange under IRC Section 1031. Seller's contemplated exchange shall not impose upon Buyer any additional liability or financial obligation".

By mid-October of 2001, however, Bartell Drug had received two offers to purchase the Lynnwood property that would have enabled the company to use the site in a sale-leaseback arrangement. Consequently, Bartell Drug management requested from KeyBank an additional extension of the construction loan to negotiate that possibility. KeyBank acceded to the request and a concomitant modification and/or extension agreement dated October 17, 2001, was executed by EPC Two. On November 28, 2001, however, the Bartell Drug board of directors approved the sale of the Everett store, observing that the "proceeds will be used to purchase our store in Lynnwood".

Exchange Agreement

On December 17, 2001, Bartell Drug as "Exchangor" and Section 1031 Services as "Intermediary" executed an exchange agreement for the exchange of relinquished property, identified as the Everett property, for replacement property, identified as the Lynnwood property, in a transaction intended "to qualify for tax-deferred treatment under I.R.C. Section 1031". The exchange agreement provided

for the purchase agreement with the Engs and for Bartell Drug's rights under the REAECA to be assigned to Section 1031 Services. Section 1031 Services would then transfer the relinquished property to the Engs, acquire the replacement property from EPC Two, and transfer the replacement property to Bartell Drug. These transfers were to be accomplished through a direct deeding mechanism, i.e., conveyance of title between Bartell Drug and the underlying buyer or seller at Section 1031 Services' direction. The purchase price for the relinquished property would be paid to Section 1031 Services and used by Section 1031 Services to acquire the replacement property from EPC Two. Bartell Drug agreed to indemnify Section 1031 Services from all loss in general and from any claims related to hazardous materials in particular.

By letter dated likewise December 17, 2001, Section 1031 Services sent to Bartell Drug, to the company's attorney, and to the escrow agent for the Lynnwood transaction a substitute exhibit for the REAECA. The exhibit identified the Everett property as the relinquished property for the exchange. Two further letters of the same date were sent by Section 1031 Services to the escrow agent for the approaching closings, transmitting the exchange intermediary's instructions to escrow for the relinquished and replacement property, respectively.

Closing of the Exchange

Finalization of the transfers of the Everett and Lynnwood properties took place between December 26, 2001, and January 3, 2002. On December 26, 2001, Bartell Drug executed an assignment of the purchase agreement for the Everett property, and Section 1031 Services provided notification of that assignment to the Engs. In conjunction therewith, Bartell Drug also executed a special warranty deed conveying the Everett property to entities managed by the Engs. The deed was recorded on December 28, 2001.

On December 27 or 28, 2001, EPC Two executed a statutory warranty deed conveying the Lynnwood property to Bartell Drug, and the deed was recorded on December 31, 2001. On January 3, 2002,[9] Bartell Drug executed an assignment of the REAECA to Section 1031 Services. Section 1031 Services had previously on December 17, 2001, provided notice of the assignment to EPC Two.

Through the respective escrow processes, sale of the Everett property provided a net amount after charges of $4,132,752.09, which was applied toward purchase of the Lynnwood property. From that balance, charges paid out of the escrow included $10,249.81 remitted to Exchange Structures as "Final Rent

_____

[9]Although the pertinent signature is dated "1/3/01", the document refers to the parties' having executed the exchange agreement, which did not occur until December 17, 2001.

Payment" and $1,500 remitted to Section 1031 Services as "Exchange Fee". An excess payment of $128,194.05 was due from the buyer, to be furnished by Bartell Drug under the exchange agreement, to complete the transaction.

Tax Reporting and Examination

For 2001 and prior years, Bartell Drug filed with the IRS Forms 1120S, U.S. Income Tax Return for an S Corporation. Included with the 2001 return was a Form 8824, Like-Kind Exchanges, addressing the transfers of the Everett and Lynnwood properties. Bartell Drug reported that the property relinquished in the subject exchange had been acquired on August 1, 2000, and had been transferred to another party on December 28, 2001. The company further reported that like-kind property was actually received on January 2, 2002. The fair market value of the property received was shown as $4,134,592 and the basis of the property given up as $1,329,729, for a deferred gain of $2,804,863.

Schedules K-1, Shareholder's Share of Income, Credits, Deductions, etc., were prepared for each of Bartell Drug's shareholders, i.e., George H. Bartell, Jr., George D. Bartell, and Jean B. Barber, setting forth his or her respective shares of Bartell Drug's items of income and deduction. Petitioners filed Forms 1040, U.S. Individual Income Tax Return, for 2001 and subsequent years at issue reflecting, inter alia, amounts flowing through from Bartell Drug's corporate returns. The

gain realized from the sale of the Everett property, having been treated as deferred by Bartell Drug, was not reported by the individual petitioners.

In early 2004, the IRS commenced an examination of Bartell Drug's 2001 corporate return. That audit culminated in a Form 5701, Notice of Proposed Adjustment, dated December 10, 2004, and corresponding Form 886A, Explanation of Items. The single adjustment proposed was the disallowance of tax deferral treatment under section 1031 for the $2,804,863 reported as realized in the like-kind exchange involving the Lynnwood and Everett properties. The notices of deficiency underlying the instant cases followed, as the resultant increase in corporate income flowed through to the personal returns of the shareholders.

## OPINION

### I.    Burden of Proof

As a general rule, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving error therein. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, section 7491(a)(1) may shift the burden to the Commissioner with respect to factual issues affecting liability for tax where the taxpayer introduces credible evidence, but the provision operates only where the taxpayer establishes that he has complied under section 7491(a)(2) with

all substantiation requirements, has maintained all required records, and has cooperated with reasonable requests for witnesses, information, documents, meetings, and interviews.  See H.R. Conf. Rept. No. 105-599, at 239-240 (1998), 1998-3 C.B. 747, 993-994.

Petitioners assert that they have met the record retention, cooperation, and introduction of credible evidence requisites for a shift of the burden of proof. Respondent argues to the contrary.  Nonetheless, we find it unnecessary to decide whether the burden should be shifted under section 7491(a).  As will be detailed infra, the crux of the parties' disagreement as to the outcome of these cases lies not in different views as to what took place but in different positions as to what standard or test should be applied in analyzing whether those events generated taxable income for petitioners.  The relevant facts are substantially those gleaned from the documentary record, the bulk of which has been stipulated.  Together with a small number of additional documents offered at trial, these materials afford the Court a largely uncontroverted view of what happened.  Once the more legal or theoretical question in dispute is answered, the record is not evenly weighted and is sufficient for the Court to render a decision on the merits based upon a preponderance of the evidence, without regard to the burden of proof.  Because there is no "evidentiary tie" here, the burden of proof need not be resolved.  See

Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), aff'g T.C. Memo. 2003-212.

## II.  Treatment of the Lynnwood Property Transaction

### A.  Contentions of the Parties

Petitioners argue that the transaction involving the Lynnwood property is properly treated as a like-kind exchange, thus permitting deferral of income realized upon the disposition of the Everett property.  Respondent, conversely, asserts that the transaction in question failed to qualify for section 1031 treatment.  Their differences center on whether an exchange for purposes of section 1031 occurred.  It has been observed that the "very essence of an exchange is the transfer of property between owners, while the mark of a sale is the receipt of cash for the property".  Carlton v. United States, 385 F.2d 238, 242 (5th Cir. 1967).  A corollary of the requirement of a reciprocal transfer of property between owners is that the taxpayer not have owned the property purportedly received in the exchange before the exchange occurs; if he has, he has engaged in a nonreciprocal exchange with himself.  "A taxpayer cannot engage in an exchange with himself; an exchange ordinarily requires a 'reciprocal transfer of property, as distinguished from a transfer of property for money consideration'."  DeCleene v. Commissioner, 115 T.C. 457, 469 (2000) (citation omitted).

Respondent maintains that Bartell Drug already owned the Lynnwood property long before the December 2001 disposition of the Everett property, thereby precluding any exchange as of that date. Petitioners contend that Bartell Drug was not then the owner of the Lynnwood property; rather, EPC Two must be treated as the owner. These different results, in turn, are explained by the different tests employed by the parties to answer the ownership question. Petitioners claim that an agency analysis is the appropriate standard and that such an analysis should be employed in a manner consistent with the wide latitude historically permitted in the context of like-kind exchanges. Respondent, on the other hand, advocates application of a benefits and burdens analysis as the traditional test in the myriad of situations raising questions of tax ownership of property.

B. <u>Statutory Principles and Regulatory Developments</u>

Generally, under sections 61(a)(3) and 1001(c), taxpayers must recognize all gain or loss realized upon the sale or exchange of property. Section 1031, however, provides an exception which allows taxpayers to defer recognition of gain or loss on exchanges of like-kind property held for productive use in a trade or business or for investment. The statute sets forth in section 1031(a) the following general rule: "No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such

property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment." This general rule for nonrecognition mandates that qualifying property be exchanged "solely" for other qualifying property. In the event that non-like-kind property, including cash, is received in a transaction otherwise within the purview of the statute, section 1031(b) establishes a regime whereby any gain realized on the exchange is recognized to the extent of the so-called boot, i.e., the nonqualifying property. Any gain not recognized is then deferred through operation of section 1031(d), under which the basis of property acquired in a like-kind exchange equals the basis of the property transferred, less any cash received and loss recognized, plus any gain recognized.

The purpose for the foregoing deferral has been identified in jurisprudence involving section 1031 and its predecessor statutes as resting on the lack of any material change in the taxpayer's economic position. Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 268 (1958); DeCleene v. Commissioner, 115 T.C. at 466; Koch v. Commissioner, 71 T.C. 54, 63-64 (1978). The new property is substantially a continuation of the taxpayer's investment in the old property, still unliquidated; the taxpayer's funds remain tied up in the same kind of property. Commissioner v.

P.G. Lake, Inc., 356 U.S. at 268; Koch v. Commissioner, 71 T.C. at 63-64; H.R. Rept. No. 73-704 (1934), 1939-1 C.B. (Part 2) 554, 564.

Given that rationale, courts have frequently interpreted the requirements of section 1031 liberally, exhibiting a lenient attitude toward taxpayers' attempts to come within its terms. See, e.g., Starker v. United States, 602 F.2d 1341, 1352-1353 (9th Cir. 1979); DeCleene v. Commissioner, 115 T.C. at 467; Biggs v. Commissioner, 69 T.C. 905, 913-914 (1978), aff'd, 632 F.2d 1171 (5th Cir. 1980). The Commissioner likewise has often taken a similar approach in regulations promulgated and guidance issued under section 1031, even affording various safe harbors for transactions. Secs. 1.1031(a)-1 to 1.1031(k)-1, Income Tax Regs. Such breadth has developed incrementally over time, as will be seen in the discussion infra.

The words "like kind" as used in section 1031 are defined to "have reference to the nature or character of the property and not to its grade or quality." Sec. 1.1031(a)-1(b), Income Tax Regs. It is the "kind or class" of the property that must be the same, such that the "fact that any real estate involved is improved or unimproved is not material, for that fact relates only to the grade or quality of the property and not to its kind or class." Id.

Historically, there has never been any question that section 1031 as originally enacted covered simultaneous exchanges between two parties. See, e.g., Starker, 602 F.2d 1341; Alderson v. Commissioner, 317 F.2d 790 (9th Cir. 1963), rev'g 38 T.C. 215 (1962); and cases discussed therein. However, following cases finding a broader reach, the statute itself and regulatory directives were likewise widened explicitly to address various deferred exchanges (where the exchange of properties is not simultaneous) and multiparty transactions (where third-party exchange facilitators are used to effect the exchange). For instance, after Starker, 602 F.2d 1341, Congress amended section 1031(a) expressly to sanction specified deferred exchanges by adding the following:

> (3) Requirement that property be identified and that exchange be completed not more than 180 days after transfer of exchanged property.--For purposes of this subsection, any property received by the taxpayer shall be treated as property which is not like-kind property if--
>
>> (A) such property is not identified as property to be received in the exchange on or before the day which is 45 days after the date on which the taxpayer transfers the property relinquished in the exchange, or
>>
>> (B) such property is received after the earlier of--
>>
>>> (i) the day which is 180 days after the date on which the taxpayer transfers the property relinquished in the exchange, or

        (ii) the due date (determined with regard to extension) for the transferor's return of the tax imposed by this chapter for the taxable year in which the transfer of the relinquished property occurs.

Comprehensive regulations were later issued in section 1.1031(k)-1, Income Tax Regs., to facilitate deferred "forward" exchanges (i.e., where the taxpayer receives replacement property after the date of his transfer of relinquished property) within the confines of the statutory time limits. (However, the Secretary expressly declined to provide guidance with respect to deferred "reverse" exchanges (i.e., where the taxpayer receives replacement property before the date of his transfer of relinquished property)). See T.D. 8346, 1991-1 C.B. 150, 151. As has been noted by this Court: "These regulations, with their provisions for use of third-party 'qualified intermediaries' as accommodation titleholders, who will not be considered the taxpayer's agent in doing the multiparty deferred exchanges permitted by the regulations, have encouraged the growth of a new industry of third-party exchange facilitators." DeCleene v. Commissioner, 115 T.C. at 467.

Nonetheless, even with these regulatory developments, the full reach and range of transactions entitled to protection under section 1031 remained unsettled, as was made clear in the preamble to the regulations:

        Section 1031(a)(3) of the Code and § 1.1031(a)-3 of the proposed regulations apply to deferred exchanges. The proposed

regulations define a deferred exchange as an exchange in which, pursuant to an agreement, the taxpayer transfers property held for productive use in a trade or business or for investment (the "relinquished property") and subsequently receives property to be held either for productive use in a trade or business or for investment (the "replacement property"). The proposed regulations do not apply to transactions in which the taxpayer receives the replacement property prior to the date on which the taxpayer transfers the relinquished property (so-called "reverse-Starker" transactions.) * * *

* * * * * * *

However, the Service will continue to study the applicability of the general rule of section 1031(a)(1) to these transactions.

T.D. 8346, 1991-1 C.B. at 150-151.

The vacuum in any administrative guidance concerning reverse exchanges was not alleviated until the issuance by the IRS of Rev. Proc. 2000-37, 2000-2 C.B. 308. The revenue procedure addressed specified "parking" arrangements and provided

a safe harbor under which the Internal Revenue Service will not challenge (a) the qualification of property as either "replacement property" or "relinquished property" * * * for purposes of § 1031 of the Internal Revenue Code and the regulations thereunder or (b) the treatment of the "exchange accommodation titleholder" [10] as the beneficial owner of such property for federal income tax purposes, if

---

[10]Under Rev. Proc. 2000-37, 2000-2 C.B. 308, the "exchange accommodation titleholder" is, generally, a person other than the taxpayer who is subject to Federal income tax and who holds legal title to, or other indicia or ownership of, property intended to be exchanged in a transaction qualifying under sec. 1031. See Rev. Proc. 2000-37, sec. 4.02(1), 2000-2 C.B. at 309.

the property is held in a "qualified exchange accommodation arrangement" (QEAA) * * *

Id. sec. 1, 2000-2 C.B. at 308.

The revenue procedure was effective for qualified exchange accommodation arrangements entered into by an exchange accommodation titleholder on or after September 15, 2000. Id. sec. 5, 2000-2 C.B. at 310. Conversely, per the procedure,

> [n]o inference is intended with respect to the federal income tax treatment of arrangements similar to those described in this revenue procedure that were entered into prior to the effective date of this revenue procedure. Further, the Service recognizes that "parking" transactions can be accomplished outside of the safe harbor provided in this revenue procedure. Accordingly, no inference is intended with respect to the federal income tax treatment of "parking" transactions that do not satisfy the terms of the safe harbor provided in this revenue procedure, whether entered into prior to or after the effective date of this revenue procedure.

Id. sec. 3.02, 2000-2 C.B. at 308.

The revenue procedure observed that in the years since the deferred forward exchange regulations were published, taxpayers had attempted to structure a wide variety of reverse "parking" transactions arranged "so that the accommodation party has enough of the benefits and burdens relating to the property" to be treated as the owner. Id. sec. 2.05, 2000-2 C.B. at 308. The procedure then imposed time limits paralleling those for deferred exchanges (45 and 180 days) and enumerated

specific contractual provisions and/or relationships that would not be considered fatal to treatment of the "exchange accommodation titleholder" as the owner of the replacement or relinquished property for Federal income tax purposes. Id. sec. 4, 2000-2 C.B. at 309.

C. Application of Caselaw Principles

Bartell Drug undertook the transaction involving the Lynnwood property before Rev. Proc 2000-37, supra, was published on October 2, 2000. See Rev. Proc. 2000-37, 2000-40 I.R.B. 308. There is no dispute that Rev. Proc. 2000-37, supra, is inapplicable. EPC Two acquired title on August 1, 2000, before the revenue procedure's effective date, and the complete transaction consumed 17 months, well beyond the 180 days that would have been allowed for closing the transaction under it. Hence, each side contends for its respective position on whether a qualifying exchange occurred by drawing on general tax principles and caselaw it considers applicable.

The fundamental question in determining whether section 1031 applies here is whether an exchange occurred. The answer to that inquiry will depend, in this context and as framed by the parties' positions, on whether what happened here should be deemed a self-exchange. A self-exchange, in turn, will be said to have

transpired if Bartell Drug would be considered the owner of the Lynnwood property for tax purposes before acquiring title in December of 2001.

Respondent contends that Bartell Drug already owned the Lynnwood property at the time of the disputed exchange because Bartell Drug--not EPC Two--had all the benefits and burdens of ownership of the property; namely, the capacity to benefit from any appreciation in the property's value, the risk of loss from any diminution in its value, and the other burdens of ownership such as taxes and liabilities arising from the property. By contrast, respondent contends, EPC Two did not possess any of the benefits and burdens of ownership of the property; it had no equity interest in the property, it had made no economic outlay to acquire it, it was not at risk with respect to the property because all the financing was nonrecourse as to it, it paid no real estate taxes, and the construction of improvements on the property was financed and directed by Bartell Drug. Moreover, respondent contends, Bartell Drug had possession and control of the property during the entire period EPC Two held title, first by virtue of the REAECA provisions giving it control over the construction of site improvements and then possession through a lease that EPC Two was obligated under the REAECA to extend to it, for rent equal to the debt service on the KeyBank loan plus EPC Two's fee for holding title. Respondent's position is that a benefits and

burdens test, which is used in many contexts to determine ownership of property for Federal tax purposes, see, e.g., Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981), should be applied in the context of a claim of section 1031 treatment to determine who owns the replacement property, as between a third-party exchange facilitator who takes legal title to it to facilitate an exchange and the taxpayer who ultimately receives it at the time of the exchange.

Petitioners point out, however, that both this Court and the Court of Appeals for the Ninth Circuit, to which an appeal in this case would ordinarily lie, see sec. 7482(b), have expressly rejected the proposition that a person who takes title to the replacement property for the purpose of effecting a section 1031 exchange must assume the benefits and burdens of ownership in that property to satisfy the exchange requirement. As the Court of Appeals for the Ninth Circuit pointed out in Alderson v. Commissioner, 317 F.2d at 795:

> [O]ne need not assume the benefits and burdens of ownership in property before exchanging it but may properly acquire title solely for the purpose of exchange and accept title and transfer it in exchange for other like property, all as a part of the same transaction with no resulting gain which is recognizable under Section 1002 of the Internal Revenue Code of 1954.

We have followed Alderson in according section 1031 treatment in a variety of transactions where the taxpayers used a third-party exchange facilitator to take

title to the replacement property to effect an exchange of property in form, who was contractually insulated from any beneficial ownership of the replacement property.  See, e.g., Garcia v. Commissioner, 80 T.C. 491 (1983); Barker v. Commissioner, 74 T.C. 555 (1980); Biggs v. Commissioner, 69 T.C. 905.  When the third-party exchange facilitator has been contractually excluded from beneficial ownership pursuant to the agreement under which he holds title to the replacement property for the taxpayer, that beneficial ownership necessarily resides with the taxpayer once title has been obtained from the seller of the replacement property.  And yet the third-party exchange facilitator, rather than the taxpayer, has been treated as the owner of the replacement property at the time of the exchange in the cases cited above.  Otherwise, a disqualifying self-exchange could be said to have occurred.

The somewhat formalistic approach of the caselaw on which petitioners rely is perhaps best explained by this Court's observations over 35 years ago in Barker v. Commissioner, 74 T.C. at 560-561, 565:

> The touchstone of section 1031 * * * is the requirement that there be an exchange of like-kind business or investment properties, as distinguished from a cash sale of property by the taxpayer and a reinvestment of the proceeds in other property.
>
> The "exchange" requirement poses an analytical problem because it runs headlong into the familiar tax law maxim that the

substance of a transaction controls over form.  In a sense, the substance of a transaction in which the taxpayer sells property and immediately reinvests the proceeds in like-kind property is not much different from the substance of a transaction in which two parcels are exchanged without cash. * * *

* * * * * * *

[T]he conceptual distinction between an exchange qualifying for section 1031 on the one hand and a sale and reinvestment on the other is largely one of form.

Petitioners further point out that settled caselaw has permitted taxpayers to exercise any number of indicia of ownership and control over the replacement property before it is transferred to them, without jeopardizing section 1031 exchange treatment.  As we noted in Biggs v. Commissioner, 69 T.C. at 913-914:

[C]ourts have permitted taxpayers great latitude in structuring [section 1031 exchange] transactions.  * * * The taxpayer can locate suitable property to be received in exchange and can enter into negotiations for the acquisition of such property.  Coastal Terminals, Inc. v. United States, 320 F.2d 333, 338 (4th Cir. 1963); Alderson v. Commissioner, 317 F.2d at 793; Coupe v. Commissioner, 52 T.C. at 397-398.  Moreover, the taxpayer can oversee improvements on the land to be acquired (J.H. Baird Publishing Co. v. Commissioner, 39 T.C. at 611) and can even advance money toward the purchase price of the property to be acquired by exchange (124 Front Street, Inc. v. Commissioner, 65 T.C. 6, 15-18 (1975)).  Provided the final result is an exchange of property for other property of a like kind, the transaction will qualify under section 1031.[11]

---

[11]This discussion of the latitude afforded taxpayers in structuring sec. 1031 transactions was later quoted in full with approval by the Court of Appeals for the

(continued...)

In <u>Biggs</u>, the taxpayer was likewise permitted to advance the funds for the purchase of the replacement property, where title was transferred from the seller to a third-party exchange facilitator and held by it until the exchange was effected. <u>Id.</u> at 908-909.

Respondent, however, relies in particular on our more recent decision in <u>DeCleene</u>, in which we employed a benefits and burdens analysis in rejecting the taxpayer's claim of section 1031 treatment, as support for his contention that a third-party exchange facilitator--here, EPC Two--must hold the benefits and burdens of ownership of the replacement property in order to be treated as its owner at the time of the exchange. In <u>DeCleene</u> we concluded, using a benefits and burdens analysis, that the taxpayer had beneficial ownership of the replacement property at the time of the exchange, even though he had arranged for the transfer of legal title to the replacement property to the purchaser of his relinquished property. His purported exchange of the relinquished and replacement properties was therefore no more than an exchange with himself. "A taxpayer cannot engage in an exchange with himself; an exchange ordinarily

---

[11](...continued)
Ninth Circuit. <u>Starker v. United States</u>, 602 F.2d 1341, 1353 n.10 (9th Cir. 1979).

requires a 'reciprocal transfer of property'". <u>DeCleene v. Commissioner</u>, 115 T.C. at 469 (citation omitted).

The taxpayer in <u>DeCleene</u> had made an outright purchase of the replacement property (the Lawrence Drive property), which was unimproved land, more than a year before the purported exchange. <u>Id.</u> at 459, 468. Then, when approached by a prospective purchaser (WLC) of the property the taxpayer wished to relinquish (the McDonald Street property), the taxpayer was advised he could effect a section 1031 exchange of the McDonald Street property for the Lawrence Street property. <u>Id.</u> at 459. In an effort to accomplish an exchange, the taxpayer first transferred the Lawrence Street property to WLC in September--subject to a reacquisition agreement under which WLC agreed to convey the Lawrence Drive property back to the taxpayer by yearend, with a building constructed on it in the interim pursuant to the taxpayer's direction and at his expense.[12] <u>Id.</u> at 468-469. WLC purported to purchase the Lawrence Drive property by giving the taxpayer his non-interest-bearing, nonrecourse note for $142,400. <u>Id.</u> at 460. The parties agreed that $142,400 was the value of both the Lawrence Drive property in its unimproved state and the McDonald Street property. <u>Id.</u> at 463. Once

---

[12]The construction loan for the building was nonrecourse to WLC and guaranteed by the taxpayer. <u>DeCleene v. Commissioner</u>, 115 T.C. 457, 461 (2000).

construction of the building on the Lawrence Drive property was complete, but no later than yearend, the parties' agreement called for an exchange of properties whereby the taxpayer would deed the McDonald Street property to WLC and WLC would in turn deed the Lawrence Drive property back to the taxpayer and pay off his $142,400 promissory note (the consideration it gave for the purported purchase of the Lawrence Drive property). Id. at 460-461. The exchange of deeds and payment of the note were accomplished three months later as called for under the agreement. Id. at 463.

The taxpayer claimed that he had effected a taxable sale of the Lawrence Drive property to WLC, followed by his transfer of the McDonald Street property to WLC in a like-kind exchange for WLC's reconveyance to him of the Lawrence Drive property.[13] The Commissioner determined that the taxpayer had made a taxable sale of the McDonald Street property to WLC.

In resolving the issue, after noting the historically lenient attitude of courts towards taxpayers in like-kind exchange cases, we put considerable emphasis on the taxpayer's failure to use a third-party exchange facilitator.

> The subject transactions present a case of first impression in this Court. They reflect the effort of * * * [the taxpayer] and his

---

[13]The taxpayer preferred a taxable sale of his high-basis Lawrence Drive property to a taxable sale of his low-basis McDonald Street property.

advisors to implement a so-called reverse exchange directly with WLC, <u>without the participation of a third-party exchange facilitator</u>. * * *

*     *     *     *     *     *     *

In the case at hand, * * * [the taxpayer] did not just locate and identify the Lawrence Drive property in anticipation of acquiring it as replacement property in exchange for the McDonald Street property that he intended to relinquish. He purchased the Lawrence Drive property <u>without the participation of an exchange facilitator</u> a year or more before he was ready to relinquish the McDonald Street property * * * . In the following year, * * * [the taxpayer] transferred title to the Lawrence Drive property, subject to a reacquisition agreement-- the exchange agreement--<u>not to a third-party exchange facilitator</u>, but to WLC, the party to which he simultaneously obligated himself to relinquish the McDonald Street property. * * *

In foregoing the use of a third party and doing all the transfers with WLC, * * * [the taxpayer] and his advisers created an inherently ambiguous situation. * * *

<u>DeCleene v. Commissioner</u>, 115 T.C. at 467-469 (emphasis added).

We analyzed the transaction to determine whether the taxpayer, having acquired the Lawrence Drive property outright and directly held it for more than a year, actually ceased being its owner for tax purposes during the three-month period that WLC held legal title in anticipation of a section 1031 exchange. If not, then the taxpayer had merely engaged in an exchange with himself, rather than the reciprocal exchange of property necessary for section 1031 treatment. <u>Id.</u> at 469. We employed a benefits and burdens test to determine the ownership question,

concluding that WLC never acquired any of the benefits and burdens of ownership of the Lawrence Drive property, as it acquired no equity interest, made no economic outlay to acquire the property, was not at risk because its obligations in the transaction were all nonrecourse, and was obligated to reconvey the property to the taxpayer. Id. at 469-470. As a consequence, "[i]n substance, * * * [the taxpayer] never disposed of the Lawrence Drive property and remained its owner during the 3-month construction period because the transfer of title to WLC never divested * * * [the taxpayer] of beneficial ownership." Id. at 471. We therefore concluded that a section 1031 exchange had not occurred.

In contending that DeCleene supports his position that EPC Two--a third-party exchange facilitator--had to possess the benefits and burdens of ownership of the Lynnwood property in order for EPC Two to be treated as its owner for tax purposes before the exchange, respondent interprets that case too broadly. Given the DeCleene Opinion's explicit and repeated emphasis upon the taxpayer's failure to use a third-party exchange facilitator, it must be said that DeCleene did not address the circumstances where a third-party exchange facilitator is used from the outset in a reverse exchange. Moreover, the taxpayer in DeCleene had acquired the purported replacement property outright, and held title to it directly without any title-holding intermediary, for more than a year before transferring title to

WLC.  This feature also distinguishes DeCleene from the myriad of cases where taxpayers seeking section 1031 treatment were careful to interpose a title-holding intermediary between themselves and outright ownership of the replacement property.  In sum, DeCleene does not dictate a result for respondent here.

Our analysis must also take into account the position of the Court of Appeals for the Ninth Circuit, where an appeal in this case would lie absent stipulation to the contrary.  See sec. 7482(b)(1)(A), (2); Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).[14]  As previously noted, that Court of Appeals has expressly rejected the contention that the party to the exchange with the taxpayer must possess the benefits and burdens of ownership of the replacement property in order for the exchange to qualify for section 1031 treatment.  Alderson v. Commissioner, 317 F.2d at 795.

The taxpayers in Alderson had executed a contract to sell their Buena Park property to Alloy Die Casting Co. (Alloy) for $172,871.40, pursuant to an escrow agreement under which Alloy had deposited 10% of the purchase price into escrow.  The taxpayers then found the Salinas property, and decided that they wished to obtain it to replace the Buena Park property.  The taxpayers and Alloy

---

[14]In DeCleene we noted the paucity of applicable sec. 1031 cases in the Court of Appeals for the Seventh Circuit, where the appeal in that case lay. DeCleene v. Commissioner, 115 T.C. at 472.

thereupon amended the escrow agreement to provide that Alloy would acquire the Salinas property and exchange it for the Buena Park property "in lieu of the original contemplated cash transaction." Id. at 791.

As recounted by the Court of Appeals for the Ninth Circuit, the taxpayers then took a series of steps with respect to the Salinas property--the replacement property--that warrant close scrutiny in view of the arguments respondent has advanced in this case. The taxpayers negotiated the $190,000 sale price of the Salinas property with its owners and then, on August 19, 1957, through written instructions to the Salinas Title Guarantee Co. (Salinas Title) executed on that date,[15] the taxpayers dictated the terms for the disposition of the Salinas property. Id. The instructions provided that the taxpayers would make the $19,000 downpayment for the property (which they paid into the Salinas escrow the next day) and that title to the Salinas property would be taken in the name of Salinas Title. Id. The instructions further authorized Salinas Title "to deed the Salinas property to Alloy, provided Salinas Title could 'immediately record a deed from Alloy * * * to James Alderson and Clarissa E. Alderson, his wife [the taxpayers], issuing final title evidence in the last mentioned grantees.'" Id.

_____

[15]These escrow instructions for the disposition of the replacement property were entitled "Buyer's Instructions", the Court of Appeals noted. Alderson v. Commissioner, 317 F.2d 790, 791 (9th Cir. 1963), rev'g 38 T.C. 215 (1962).

By deed dated the next day (August 20, 1957), title to the Salinas property was transferred to Salinas Title.  Alderson v. Commissioner, 317 F.2d at 791.  By deed dated August 21, 1957, Salinas Title conveyed the Salinas property to Alloy.  Id.  By deed dated August 26, 1957, the taxpayers conveyed the Buena Park property to Alloy, and by deed dated August 29, 1957, Alloy conveyed the Salinas property to the taxpayers.  Id. at 791-792.  On September 3, 1957, Alloy deposited the $172,871.40 purchase price of the Buena Park property into the Salinas escrow with instructions that it be used to purchase the Salinas property.  Id. at 792. That amount, together with the $19,000 previously deposited by the taxpayers, slightly exceeded the $190,000 purchase price of the Salinas property, and the excess was refunded to the taxpayers.[16]  Id.  The following day, all of the foregoing deeds were recorded.  Id.

The taxpayers took the position that they had effected a section 1031 exchange of the Buena Park property for the Salinas property, but the Commissioner disagreed, arguing that they had sold the Buena Park property to Alloy and purchased the Salinas property, in part because Alloy never held a

---

[16]The 10% deposit that Alloy had previously placed into escrow to purchase the Buena Park property was refunded to it.  Alderson v. Commissioner, 317 F.2d at 792.

"real" interest in the Salinas property--that is, the replacement property.  Id. at 795.

The Court of Appeals rejected the Commissioner's argument.

> [T]here was no need for Alloy to acquire a "real" interest in the Salinas property by assuming the benefits and burdens of ownership to make the exchange qualify under the statute although * * * [the Commissioner] asserts that failure of Alloy to hold a "real" interest in the Salinas property precluded the transactions involved from being construed as constituting an exchange.
>
> [O]ne need not assume the benefits and burdens of ownership in property before exchanging it but may properly acquire title solely for the purpose of exchange and accept title and transfer it in exchange for other like property, all as a part of the same transaction with no resulting gain which is recognizable under Section 1002 of the Internal Revenue Code of 1954.

Id.

Neither Salinas Title, the third-party exchange facilitator, nor Alloy, the acquirer of the taxpayer's relinquished property, assumed any benefits or burdens of the Salinas property (the replacement property) before the exchange.  Salinas Title obtained title to the Salinas property subject to a contractual obligation in the Buyer's Instructions to transfer it to Alloy.  Then Alloy obtained title to the property under a contractual obligation that it immediately transfer title to the taxpayers.  Consequently, the beneficial ownership of the Salinas property necessarily resided with the taxpayers during the period that Salinas Title and Alloy held bare legal title to the property; it could be nowhere else.  Thus, the

taxpayers in <u>Alderson</u> held the benefits and burdens of the replacement property before the exchange. Under the theory advanced by respondent in this case, the <u>Alderson</u> taxpayers would have engaged in a disqualifying exchange with themselves. The Court of Appeals, however, treated Alloy's nominal ownership of the replacement property as sufficient to establish an exchange for purposes of section 1031.

The transaction in <u>Alderson</u> was a forward exchange that spanned approximately three months from the time the taxpayers first executed a contract for the sale of their relinquished property until the deed transfers effecting the exchange of the relinquished and replacement properties were made. Salinas Title held title to the replacement property for only 10 days, and Alloy held it only instantaneously. Yet the same principle that treated a third-party exchange facilitator, holding bare legal title but no beneficial interest in the replacement property, as the owner of that property for purposes of a section 1031 exchange is also evident in <u>Biggs v. Commissioner</u>, 632 F.2d 1171, a case where the exchange facilitator held the replacement property much longer.

In <u>Biggs</u>, the third-party exchange facilitator held bare legal title but no beneficial interest in the replacement property from the time the replacement property was purchased (with the taxpayer's funds) until title was transferred to

the taxpayer--a period of approximately 4 1/2 months. In that case, the taxpayer agreed to sell his Maryland property (the relinquished property) to Powell, but only as part of an exchange for another property. Powell agreed to cooperate in the arrangements for an exchange. The taxpayer identified a replacement property, the Virginia property, executed a sales contract for its purchase in which the purchaser was described as the taxpayer "(acting as agent for syndicate)", and supplied the downpayment. Id. at 1173. Powell, however, was "either unable or unwilling" to take title to the Virginia property and so the taxpayer arranged for the title to be transferred to Shore Title Co., Inc. (Shore), a corporation controlled by the taxpayer's attorney. Id.

Before the transfer of title, the taxpayer and Shore entered into an agreement concerning the Virginia property that entitled either to request that title be conveyed to the taxpayer or his nominee in exchange for the price Shore paid for the property, plus any costs Shore incurred in holding the property, and a commitment by the taxpayer or his nominee to release Shore from, or cause Shore to be released from, any obligations of Shore arising from its acquiring or holding the property. Id. On January 9, 1969, the sales contract on the Virginia property was closed and title was transferred to Shore. Id. The taxpayer advanced to Shore

the remaining cash due the seller, $115,655.14, and Shore assumed liabilities of $142,544.86, both amounts being secured by deeds of trust on the property. Id.

Shore then held the Virginia property for the next 4 1/2 months, during which time it entered into a contract to sell the Virginia property to Powell, and Powell thereupon assigned its contract right to purchase the Virginia property to the taxpayer as part of the consideration for an agreement pursuant to which the taxpayer agreed to sell the Maryland property to Powell. Biggs v. Commissioner, 632 F.2d at 1174. The various contracts were closed (1) on May 24, 1969, when Shore executed a deed to the Virginia property to the taxpayer and the taxpayer assumed all of Shore's liabilities with respect to the property and released Shore from its obligation to repay the purchase money the taxpayer had previously advanced and (2) on May 26, 1969, when the taxpayer deeded the Maryland property to Powell's assignee. Id. at 1175.

The Court of Appeals for the Fifth Circuit and this Court both concluded that a section 1031 exchange had occurred, rejecting two arguments advanced by the Commissioner. The Commissioner argued that no exchange had occurred because Powell never received legal title to the Virginia property (the replacement property), but each Court found Powell's exchange of his right to acquire the Virginia property (rather than title to the property itself) sufficient. Id. at 1176-

1177; Biggs v. Commissioner, 69 T.C. at 914-916. Of greater pertinence here, both Courts also rejected the Commissioner's argument, premised on the fact that the taxpayer had advanced all the funds for the replacement property's purchase, that Shore was the taxpayer's agent. Biggs v. Commissioner, 632 F.2d at 1178; Biggs v. Commissioner, 69 T.C. at 917. The Court of Appeals recognized that if Shore were treated as the taxpayer's agent "the exchange would have been meaningless" because "in essence, * * * [the taxpayer] would have merely effected an exchange with himself." Biggs v. Commissioner, 632 F.2d at 1178. Instead, each Court concluded that Shore took title to the replacement property: "to facilitate an exchange" (Tax Court), Biggs v. Commissioner, 69 T.C. at 917, or "to facilitate the exchange" (Court of Appeals), Biggs v. Commissioner, 632 F.2d at 1178. The incidents of ownership Shore assumed were thus sufficient for it to be treated as the owner of the replacement property during the period it held title. Otherwise, the taxpayer, who supplied the funds for the replacement property's purchase, would have been the owner and a self-exchange ineligible for section 1031 treatment would have occurred.

Notably for the issue at hand, Shore did not have any beneficial ownership of the replacement property. Shore made no outlay to acquire the replacement property and held title to it subject to contractual provisions that precluded the

company from benefiting from any appreciation in the property's value or from being exposed to any risk of loss from a diminution in its value or any liability arising from holding title. The agreement between Shore and the taxpayer, set out in detail in each court's opinion, gave the taxpayer a "call" on the replacement property at any time for consideration equal to the price Shore paid to acquire the property, plus any costs Shore incurred to hold the property, and satisfaction or release of Shore from any obligations it assumed or became bound by as a result of holding title. Shore could likewise "put" the property to the taxpayer for the same consideration. It is thus readily apparent that the taxpayer, not Shore, held the benefits and burdens of ownership of the replacement property during the period Shore held legal title. Nevertheless Shore, a third-party exchange facilitator, was treated as the owner of the replacement property for purposes of satisfying the exchange requirement of section 1031.

Thus, Alderson and Biggs establish that where a section 1031 exchange is contemplated from the outset and a third-party exchange facilitator, rather than the taxpayer, takes title to the replacement property before the exchange,[17] the

---

[17]Respondent cites in support of his position a number of cases where the taxpayers made outright purchases of the replacement property and then subsequently sought to retrofit the transaction into the form of a sec. 1031 exchange. See, e.g., Bezdjian v. Commissioner, 845 F.2d 217 (9th Cir. 1988),

(continued...)

exchange facilitator need not assume the benefits and burdens of ownership of the replacement property in order to be treated as its owner for section 1031 purposes before the exchange.

Respondent contends that <u>Alderson</u>, <u>Biggs</u>, and the taxpayer-favorable cases we cited in <u>Biggs</u> are inapposite because they concerned forward exchanges and a reverse exchange is at issue here. We disagree. First, although <u>Biggs</u> is sometimes characterized as involving a forward exchange, the transaction at issue in <u>Biggs</u> was actually a reverse exchange as that term has been defined by respondent. In the preamble to the regulations promulgated as section 1.1031(k)-1, Income Tax Regs., governing forward exchanges, the Secretary expressly excluded reverse exchanges from coverage by those regulations, defining reverse exchanges as "transactions in which the taxpayer receives the replacement property prior to the date on which the taxpayer transfers the relinquished property". T.D. 8346, 1991-1 C.B. at 150-151; <u>see also</u> Rev. Proc. 2000-37, sec.

---

[17](...continued)
aff'g T.C. Memo. 1987-140; <u>Dibsy v. Commissioner</u>, T.C. Memo. 1995-477; <u>Lee v. Commissioner</u>, T.C. Memo. 1986-294. Bartell Drug made no such outright purchase here; it interposed a third-party exchange facilitator between itself and title to the replacement property in contemplation of a sec. 1031 exchange from the outset. These cases are therefore not helpful on the question of whether the third-party exchange facilitator is to be treated as the owner of the replacement property for Federal income tax purposes before the exchange.

2.04, 2000-2 C.B. at 308. In Biggs, although the taxpayer and Powell initially executed a "memorandum of intent" covering the sale of the relinquished property on October 25, 1968, they abandoned that agreement after the taxpayer's attorney reviewed it, and instead agreed to have their respective attorneys "work out the terms of a written exchange agreement." Biggs v. Commissioner, 632 F.2d at 1173. Thereafter, the sales contract on the replacement property (the Virginia property) was closed (and title transferred to the third-party exchange facilitator) on January 9, 1969, whereas the contract for the sale of the relinquished property (the Maryland property) was not executed until February 27, 1969, and the transfer of the relinquished property did not occur until May 26, 1969. Id. at 1174-1175. Consequently, the principles of Biggs are applicable to reverse exchanges.

Second, even forward exchange cases, including Alderson and those that permit "great latitude" to taxpayers in structuring section 1031 transactions, Starker, 602 F.2d at 1353 n.10, analyze the relationship to the replacement property of the taxpayer versus the third-party exchange facilitator, and treat the latter as the owner before the exchange, typically notwithstanding the utterly "transitory", Barker v. Commissioner, 74 T.C. at 565, and nominal nature of that ownership. In our view, this analysis of the relationship of the taxpayer to the replacement property, as compared to an exchange facilitator holding bare legal

title, is equally applicable in a reverse exchange, as the holding in <u>Biggs</u> confirms. See also <u>DeGroot v. Exchanged Titles (In re Exchanged Titles, Inc.)</u>, 159 B.R. 303 (Bankr. C.D. Cal. 1993) ("[T]he transfer of legal title is sufficient to effectuate a reverse I.R.C. § 1031 exchange involving an accommodator[.]").

To be sure, the transaction at issue involved a period before consummation of the exchange during which EPC Two was obligated to, and in fact did, lease the replacement property to Bartell Drug. Bartell Drug leased the replacement property and used it as a drugstore for approximately six months, from the completion of the improvements in early July 2011 until consummation of the exchange at yearend. There was no such leasing of the replacement property to the taxpayer by the exchange facilitator in <u>Biggs</u> or <u>Alderson</u>. Nevertheless, given that the caselaw has countenanced a taxpayer's pre-exchange control and financing of the construction of improvements on the replacement property while an exchange facilitator held title to it, <u>see</u> <u>J.H. Baird Publ'g. Co. v. Commissioner</u>, 39 T.C. 608, 610-611 (1962), we see no reason why the taxpayer's pre-exchange, temporary possession of the replacement property pursuant to a lease from the exchange facilitator should produce a different result.[18]

_____

[18]We note in this regard that the safe harbors extended to reverse exchanges in Rev. Proc. 2000-37, <u>supra</u>, cover the exchange accommodation title holder's

(continued...)

It is also true that the transaction at issue spanned a greater period than those countenanced in Alderson and Biggs, which spanned three and 4 1/2 months, respectively. Under the terms of the REAECA, EPC Two as a practical matter could have held title to the Lynnwood property for up to 24 months[19] and in fact EPC Two held title for 17 months. Given the inapplicability of Rev. Proc. 2000-37, supra, to the transaction at issue, the caselaw provides no specific limit on the period in which a third-party exchange facilitator may hold title to the replacement property before the titles to the relinquished and replacement properties are transferred in a reverse exchange.[20] We express no opinion with

---

[18](...continued)
leasing of the replacement property to the taxpayer, albeit within the time limits imposed therein. Id. sec. 4.03(4), 2000-2 C.B. 308, 310.

[19]We conclude, given that under the REAECA the purchase price Bartell Drug was obligated to pay for the Lynnwood property went from (i) the acquisition cost of the real property and improvements to (ii) the parcel's fair market value, after EPC Two had held title for 24 months, that the possibility that Bartell Drug would fail to purchase the Lynnwood property before the expiration of that 24 months was too remote to be considered a practical possibility.

[20]In scrutinizing the length of the period during which EPC Two held title to the replacement property before its transfer to Bartell Drug, we do not suggest that the transaction at issue failed to comply with the time limits of sec. 1031(a)(3), nor do the parties dispute that point. The 45- and 180-day periods in which the taxpayer must identify the replacement property and receive it, respectively, begin to run on "the date on which the taxpayer transfers the property relinquished in the exchange". Sec. 1031(a)(3)(A) and (B). As the transfer of the Everett property

(continued...)

respect to the applicability of section 1031 to a reverse exchange transaction that extends beyond the period at issue in these cases. In view of the finite periods in which the exchange facilitator in these cases could have held, and in fact did hold, title to the replacement property, we are satisfied that the transaction qualifies for section 1031 treatment under existing caselaw principles.

For the foregoing reasons, we conclude and hold that Bartell Drug's disposition of the Everett property and acquisition of the Lynnwood property in 2001 qualify for nonrecognition treatment pursuant to section 1031.

To reflect the foregoing,

Decisions will be entered for

petitioners.

---

[20](...continued)
occurred on December 28, 2001, and Bartell Drug received title to the Lynnwood property on December 31, 2001, the taxpayers satisfied those time limits.